COMMONWEALTH *vs.* ANTON RETKOVITZ.

Bristol.    October 25, 1915. — November 23, 1915.

Present: RUGG, C. J., LORING, CROSBY, PIERCE, & CARROLL, JJ.

*Evidence,* Photographs, Of intent, Corroboration of impeached witness, To explain purpose. *Practice, Criminal,* Corroboration of impeached witness, Defendant's right to change his ground during the trial, Exceptions: waiver, Right to take advantage of erroneous ruling after excepting to it.

At the trial of an indictment for the murder of a woman by cutting her throat with a razor, photographs of the neck and face of the woman, taken after her death, properly may be admitted in evidence to aid the jury in understanding the nature of the mortal wound, and are not to be excluded merely on account of the natural abhorrence aroused by the brutal character of the crime indicated, which is an inevitable incident of the trial.

At the trial of an indictment for the murder of a woman by a man with whom she previously had lived as his wife, conversations between the woman and police officers in the presence of the defendant tending to show his hostility toward her and his threats of violence to her about forty-four days before she was killed are competent to show the relations between the alleged murderer and his victim within a reasonable time before the homicide.

At the same trial, after it had been shown that the defendant had threatened to shoot the woman, and that when he was arrested a revolver was found under the stairs of the first floor of the house in which he had a room on an upper floor, the revolver was admitted in evidence, and it was *held* to have been admissible, it being a question for the jury whether the revolver was under the defendant's control and, if so, whether this indicated ill will toward the dead woman and preparation to do her injury.

At the trial of an indictment for the murder of a woman, where there is no direct evidence of the killing and two witnesses called by the Commonwealth have testified that they saw the defendant near the woman's dwelling place a short time before her death, and where, after cross-examining these two witnesses, the counsel for the defendant has stated in substance that he intends to show, if he can, that these witnesses have concealed the facts or that they were unduly

influenced to testify as they did or that their testimony is of recent contrivance, it is proper to permit the Commonwealth to show that the two witnesses made statements soon after the killing similar to those made in their testimony at the trial.

But, if at such trial, after one corroborating witness has begun to testify under the circumstances stated above, the defendant's counsel announces that he withdraws his offer of proof and will not attempt to show that the two witnesses concealed facts or were unduly influenced or that their testimony is of recent contrivance, and that instead of this his intention is merely to contradict the testimony of one of the two witnesses, and moves to have the testimony of the corroborating witness stricken out, where there is nothing to indicate that the Commonwealth is likely to be harmed by the defendant's change of attitude, the motion should be granted and the corroborating evidence should be stricken out; and a refusal to permit such a change of attitude and a denial of such a motion here were held to be sufficient ground for sustaining an exception and ordering a new trial.

The fact that the defendant's counsel at the trial above described, after the denial of his motion, contended in his closing argument to the jury that the testimony of the two witnesses was of recent invention and hence was not worthy of belief, is not in any way a waiver of his exception or a reason for refusing to sustain it; because such argument was merely using the ruling against him, which had become the law of that trial, for his own advantage in a legitimate way.

At the trial of an indictment for murder, where the cross-examination by the defendant of police officers who have testified for the Commonwealth has shown that the defendant is trying to establish the fact that the instructions which were given by these police officers to two important witnesses for the Commonwealth were given with the purpose of hiding the truth and keeping the facts from the defendant, another police officer, who was associated with those that have testified, may be permitted to testify in regard to his reasons for giving certain instructions to the two witnesses.

INDICTMENT, found and returned in the county of Bristol on June 3, 1914, charging that the defendant did assault and beat Domka Peremebida with intent to murder her by cutting her throat with a razor and by such assault and beating did kill and murder Domka Peremebida.

In the Superior Court the case was tried before *Dubuque,* J. The following facts appeared in evidence:

The deceased was employed as a servant and lived with the family of Jacob Maker on Spring Street in Fall River. It was necessary each morning that she should go from the Maker tenement through a part of the yard to get to the Maker kitchen which was on the ground floor of another four tenement house next to and connected with the house in which the Makers lived. On the morning of March 14, 1914, at about six o'clock, she was seen standing on the uppermost of three steps leading to the kitchen,

she had both hands raised to her neck, was screaming, and then fell down the steps to the ground in the yard; and upon the arrival of a physician it was found that she was dead and that death had been caused by a sharp instrument, presumably a razor, which was found near the stove in the kitchen, her neck having been cut from approximately two inches from the left of the median line to five inches to the right of the median line. There was no direct evidence to show how and by whom the injury was inflicted.

Evidence was offered by the Commonwealth tending to show that before the alleged murder the defendant and the deceased woman had lived together as husband and wife in the State of Pennsylvania and that because of some quarrel they had had in the State of Pennsylvania the deceased came to Fall River early in the month of January, 1914, and continued to live in Fall River without informing the defendant of her whereabouts; that at some time during the latter part of January, 1914, the defendant came to Fall River and made various attempts to have the deceased live with him. When she declined he threatened to injure her, and at least on one occasion, early in the month of February, 1914, he assaulted her, and on February 7, 1914, he was sentenced by the Second District Court of Bristol to a term of imprisonment of thirty days for that assault. There also was evidence tending to show that the alleged murder was committed seven days after the defendant was released from such imprisonment; that the defendant was born in Russia and had lived for a substantial portion of his life in Russia; that the razor found in the Maker kitchen was owned by the defendant; that this razor was in the defendant's possession the night before the day of the alleged murder; that the razor had Russian characters and a number inscribed on it; that a razor case, with characters and a number inscribed on it corresponding to those on the razor, was found on the morning of the alleged murder in the room occupied by the defendant the night before; that the defendant left the room early on the morning of the alleged murder and later in the same day went to Boston and did not return to Fall River until he was arrested and brought back by police officers some ten days after the day of the alleged murder; that while in Boston he made an effort to secure transportation expenses to

Pittsburg in Pennsylvania; that while in Boston he assumed the name of Philip Peremebida; that, when confronted after his arrest with police officers and others who knew him while he lived in Fall River, he denied his identity; and that during the week previous to the day of the alleged murder the defendant said that he would "cut her (meaning the deceased's) neck like a chicken."

The government introduced as evidence four photographs of parts of the deceased's body showing the wounds, the photographs having been taken at the undertaker's rooms by a photographer, to the introduction of which the defendant took exceptions. Previous to the introduction of the photographs testimony of the medical examiner was introduced describing the wounds on the body of the deceased.

Jacob and Fanny Belford occupied a house across the street from the Maker premises. As witnesses for the Commonwealth they testified in substance on direct examination that at about half past five o'clock on the morning of the alleged crime, in looking out at their window, they saw the defendant going into the premises of Jacob Maker, where the body of the deceased afterwards was found.

On cross-examination Jacob Belford testified that on the Monday after the deceased was killed he went to the police station and told the assistant marshal, one Medley, what he had seen. Violette, mentioned in the opinion, was a police officer.

Other evidence material to the exceptions is described in the opinion, where also a colloquy between the judge and the counsel is quoted from the record.

The jury returned a verdict of guilty of murder in the first degree; and the defendant alleged exceptions.

*F. M. Silvia,* for the defendant.

*J. T. Kenney,* District Attorney, for the Commonwealth.

Rugg, C. J. 1. The photographs of the neck and face of the dead woman, Domka Peremebida, for the murder of whom the defendant was on trial, rightly were admitted in evidence. It is not contended that they were not genuine and correct. They well might aid the jury in understanding the nature of the mortal wound. *Commonwealth* v. *Tucker,* 189 Mass. 457, 476, 477. It does not appear that their admission tended to inflame the jury

against the defendant or to prejudice him in any way. Natural abhorrence of a crime such as that charged in the indictment was an inevitable incident of the trial. Competent and material evidence is not to be excluded merely because it may have a tendency to cause an influence beyond the strict limits for which it is admissible. *Commonwealth* v. *Johnson,* 199 Mass. 55. *Hubbard* v. *Allyn,* 200 Mass. 166, 171. There is no suggestion that adequate instructions were not given.

2. Certain conversations between the woman alleged to have been murdered and police officers, in the presence of the defendant, tending to show his hostility toward her and his threats of violence to her about forty-four days before the homicide, properly were received in evidence. It always is relevant to show relations of enmity between an alleged murderer and his victim within a reasonable time before the homicide. Evidence covering a far longer period than in the case at bar has been held to be admissible. *Commonwealth* v. *Quinn,* 150 Mass. 401. *Commonwealth* v. *Holmes,* 157 Mass. 233.

3. There was evidence that the defendant had threatened to shoot the woman; and a revolver, which at the time he was arrested was found under the stairs of the first floor of the house, on an upper floor of which he had a room, was admitted in evidence. In this there was no error. Whether the revolver was under the control of the defendant and whether, if so, this indicated ill will toward the dead woman and preparation to do injury to her, were material questions for the consideration of the jury.

4. Two witnesses, the Belfords, called by the Commonwealth testified that they saw the defendant near the house of Domka Peremebida a short time before her death. The counsel for the defendant stated, after cross-examination, in substance that he intended to show, if he could, that these witnesses had concealed the facts, or that they were unduly influenced to testify as they did, or that their testimony was a recent contrivance. Thereupon the Commonwealth was permitted, without objection, to call a witness, Violette, to show that these two witnesses had made statements soon after the homicide similar to those given by them in testimony. Upon this posture of the case such testimony was competent.

The mere fact that a witness has made statements on other oc-

casions at variance with testimony given in court does not warrant the introducing of confirmatory evidence to the effect that he has given an account of the transaction at still other times in harmony with his sworn testimony. A party may, for the purpose of discrediting an opponent's witness, show that he has given two inconsistent narrations of the same affair, one of which was necessarily untrue. As is pointed out with clearness by Bigelow, J., in *Commonwealth* v. *Jenkins*, 10 Gray, 485, 488, when this is the state of the evidence it by no means relieves the witness of the distrust thus cast upon him to prove that the story last told was similar to an earlier version given by the witness. The two inconsistent statements still remain. Hence, under these circumstances, such corroborating evidence is inadmissible. This is the general rule. But there is an exception where the contention is made that the testimony of a witness is given under a bias or undue influence arising from some late occurrence subsequent to the main event, is a recent contrivance, or that the facts described in testimony previously have been concealed under conditions which warrant the belief that, if they were true, the witness would have been likely to have revealed them. In such a situation, evidence that the witness at earlier times before the intervention of these pernicious impulses had made statements like those given in court has a legitimate tendency to impugn the existence of these factors as operating causes to produce the testimony and thus to fortify his testimony, and therefore should be admitted. The exception to the general rule is a narrow one and is not to be extended; but, when the contentions of the parties give rise to its application, it is well established. *Griffin* v. *Boston*, 188 Mass. 475. *Brown* v. *Brown*, 208 Mass. 290. See for a full discussion of all the principles, *Commonwealth* v. *Tucker*, 189 Mass. 457, 479 to 485.

Another witness named Medley was called for the same purpose, when the defendant objected to the testimony on the ground that the Commonwealth could not introduce such evidence to support and strengthen the statements of its own witnesses and that such evidence was hearsay. Then occurred the following colloquy:

The Court: "That is the usual rule, that it isn't admissible. But where it is claimed that a party has concealed the facts, or

has been unduly influenced to testify as to what he did, I suppose it is admissible."

Mr. Kenney (District Attorney): "Or tells a different story afterwards."

The Court: "Well, merely telling a different story wouldn't make any difference. It must be a matter of concealment or a matter of bias or influence. It was admitted in the Tucker case on the ground of influence, it was claimed. In other cases it has been admitted on the ground that it is claimed that the witnesses have concealed the facts; and I suppose it is going to be claimed here that they concealed the facts, or were unduly influenced."

It is manifest that the court understood exactly and stated with precision the governing rule of law. Thereupon it was said by the defendant's counsel:

"All I am going to do in this case is contradict Mr. Belford's own testimony; that is what I am going to do. They have denied certain questions and statements put to them, and I am going to offset that, if I can, by evidence. Now why, because I intend to do that, can Mr. Medley or Mr. Violette or anybody else come in here and give a statement made to them by the Belfords, simply to corroborate the Belfords' testimony? I can't see how that is admissible."

The Court: "If you claim that the statements of the Belfords is a matter of recent contrivance, or if you claim that they have concealed facts, or that they are unduly influenced, then, the statement made to the assistant marshal is admissible. Now, 'if you don't make such a claim, that it is of recent contrivance, or that they have concealed facts or that they are unduly influenced, that is one thing. Those are the three exceptions, as I understand it, to the rule. Ordinarily the government isn't allowed to put in evidence of what witnesses have said to a police officer, prosecuting officer or other persons; the exceptions are those three that I have mentioned. Now, you are not obliged to waive them. If you say that you will make no such claim, why, that is another question; but the evidence was admitted before."

Mr. Silvia (the defendant's counsel): "Well, I was going to ask that the evidence be stricken out."

Mr. Kenney: "In answer to his honor's question, you told

what you were going to do, and your questions all tend to show that you were going to do that."

Mr. Silvia: "Very well, I claim, what I am going to try to show is, that Jacob Belford is not telling the truth."

The Court: "When I asked you if you were going to claim that he concealed the facts, or if it was a matter of recent contrivance, or he was unduly biased or influenced, you substantially acquiesced in what I said; and I said the evidence was admissible. Now, a different position cannot be taken now."

Mr. Silvia: "Well then, I will save my rights, if your honor please."

The Court: "Yes."

The substance of this discussion seems to be that the defendant withdrew from his earlier position, which was that he should contend that the testimony of the Belfords was either a recent contrivance, or was given under undue influence, or that the facts had previously been concealed, and took instead the simple ground that he should contradict Belford's testimony. This was a change of attitude as to a material aspect of the trial. That it was so understood by the judge is apparent from his ruling that "a different position cannot be taken now." This change of position is emphasized by the fact that a moment later the defendant's counsel moved to have stricken out the earlier evidence of the witness Violette and excepted to the denial of the motion. There is nothing to indicate that the Commonwealth was likely to be harmed by this change of attitude. No evidence had gone in upon the strength of the contention first advanced by the defendant, which for any reason rendered it unjust later to make a different contention. There was no such vacillation in the conduct of the defence as warranted the court in making any definite direction for the conduct of the trial, as for example, that a final election could not be made until the evidence was closed. Indeed, this was not attempted by the court. A bald ruling was made that the defendant could not thus shift his ground during the trial. We are not able to construe the ruling as meaning anything else. The situation is in no wise different from the not unusual practice of withdrawing certain counts in an indictment after evidence in their support has been introduced. *Commonwealth* v. *Cody,* 165 Mass. 133, 138. It was said in *Anthony* v. *Travis,* 148 Mass. 53,

59, 60, "Where a defendant has set up two distinct defences, the fact that evidence has been admitted upon one defence which the court holds to be untenable, will not necessarily deprive the party of the right to maintain the other because evidence irrelevant thereto was admitted in connection with the first defence." While it well may be that counsel cannot change at will every position deliberately taken by them during the trial, it cannot be said in the case at bar that there was any reason why the counsel for the defendant might not make the change for which he asked leave. No final election was made. See *Corbett* v. *Boston & Maine Railroad,* 219 Mass. 351, 357. The defendant's exception in this regard must be sustained. Although it has been suggested in argument that the defendant's change of position related solely to the testimony of Jacob Belford, the ruling of the judge also may be said to relate to him. If any difference was made between the two Belford witnesses by the defendant, the same difference exists as to the ruling.

5. The fact that the counsel for the defendant, in his closing argument to the jury, contended that the testimony of the Belfords was a recent invention and hence not worthy of credence, is of no consequence. The earlier adverse ruling had become the law of the trial and it was his right to use that ruling in any legitimate way for his own advantage.

6. There was no error in allowing the assistant marshal of the city to testify as to his reasons for giving certain instructions to the Belfords. It was stated by the court without objection or contradiction, that the defendant's cross-examination of a fellow officer had shown that the defendant would endeavor to show that the instructions had been given with a purpose to hide the truth and keep the facts from the defendant. This must be assumed to have been an accurate statement. Therefore, it was competent for the Commonwealth to show what the real reason was. *Merritt* v. *New York, New Haven, & Hartford Railroad,* 162 Mass. 326. *Lynch* v. *Coffin,* 131 Mass. 311.

*Exceptions sustained.*