COMMONWEALTH *vs.* HENRY J. BYS, JR.

Hampshire.    December 1, 1975. — May 28, 1976.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, & WILKINS, JJ.

*Homicide. Evidence,* Photograph, Judicial discretion, Admissions and confessions. *Constitutional Law,* Waiver of constitutional rights. *Waiver. Practice, Criminal,* Capital case.

In a trial on indictments charging assault with intent to rape and first degree murder, there was no error in the admission of photographs depicting some part or all of the body of the victim where the photographs were relevant to the charge of assault with intent to commit rape and to whether the homicide had been committed with extreme atrocity or cruelty. [357-361]

In a trial on indictments charging assault with intent to commit rape and first degree murder, a defendant's confession was properly ad-

mitted where there was strong evidence that the statement was voluntary and the record did not support the defendant's claim of diminished mental capacity. [361-365]

INDICTMENTS found and returned in the Superior Court on June 7, 1973.

The cases were tried before *Tisdale, J.*

*Edward L. Donnellan* for the defendant.

*Stephen R. Kaplan,* Assistant District Attorney, for the Commonwealth.

QUIRICO, J.    The defendant was tried and found guilty by a jury on two indictments, one charging that he assaulted a young lady with intent to rape her and the other that he murdered her in the first degree. The trial was held under the provisions of G. L. c. 278, §§ 33A-33G. The cases are before us on the defendant's appeal based on numerous alleged errors by the trial judge, but only two issues, grouping various exceptions, were argued in the defendant's brief. All errors alleged but not argued in the brief are treated as waived. S.J.C. Rule 1:13, as amended, 366 Mass. 853 (1975). *Commonwealth* v. *Baker,* 368 Mass. 58, 61 (1975), and cases cited. The two issues argued relate to the admission in evidence of photographs and slides of the victim's body and the defendant's oral confession.

We hold that there was no error, and on review of the case under G. L. c. 278, § 33E, we conclude that there shall be no relief thereunder.

At this point we shall summarize the pertinent evidence presented at the trial. Although the two limited issues argued by the defendant do not require us to deal with the evidence in great detail, we are unfortunately required to do so in order to place on the record some of the circumstances relevant to our denial of relief under G. L. c. 278, § 33E. We shall deal with some of the evidence further in our discussion of the two issues argued in the defendant's brief.

About 5:30 P.M. on April 27, 1973, the defendant picked up his friend of many years, Allen Bilodeau, in Chicopee, and they thereafter began to ride around in the defendant's

1962 white Ford station wagon "looking to pick up girls." They had done this together on previous occasions. Both the defendant and Bilodeau were twenty-four years old, and they had attended school together. The defendant weighed about 250 pounds and worked for the Chicopee sanitation department picking up trash barrels and emptying them into trucks. The travels of the two men on that evening can best be described as a prowl which took them through the five communities of Holyoke, Chicopee, South Hadley, Amherst and Northampton in search of prey, the intended prey being girls they might pick up. On this prowl they drove by the campus of Mt. Holyoke College several times and around the campuses of Hampshire College and the University of Massachusetts one or more times. After their last drive around the campus of the university they decided to return to Northampton.

About 9:30 to 9:45 P.M. as they were leaving Amherst, with Bilodeau driving, they saw a young lady hitchhiking. The defendant asked Bilodeau to stop and pick her up and stated that he wanted to have sexual intercourse. The young lady, hereinafter referred to as the victim, was a student at Smith College in Northampton. She got into the back seat, saying that she wanted to go to Northampton, and Bilodeau continued to drive toward Northampton. Shortly thereafter the defendant climbed over the top of the front seat where he was sitting and sat next to the victim. He made physical advances toward her which she resisted. As the car was proceeding along the main road leading directly through Northampton to Smith College, either the defendant or Bilodeau decided to go instead to some place to park. As the car left the main road the victim began to struggle and scream, begging to be let out of the car so that she could go home. The defendant then struck the victim a number of times as they continued to struggle, and she was bleeding from her nose or face. The car became stuck in mud on a beach near a body of water, which is a part of the Connecticut River and is commonly called the Oxbow, in Northampton. Bilodeau looked into the back seat and saw that the victim's blouse or sweater

was pulled up, her face was covered with blood, and the defendant was on top of her and appeared to be trying to have sexual intercourse with her.

Bilodeau walked away from the car. He then heard the wheels of the car spinning, and the defendant drove the car up to him and stopped. The victim was in the back seat. The defendant asked Bilodeau to help him carry the victim down to the water. Bilodeau refused and walked toward the water. The defendant walked over to him, grabbed him by the arm, turned him around and again asked him to help carry the victim down to the water. Bilodeau at first refused but then they walked back to the car. At that time the victim was "on the ground under the car." Her blouse was pulled up and her slacks were pulled down to about her ankles, with the rest of her body exposed.

The two men lifted the victim's body, Bilodeau by her feet and the defendant by her shoulders, and they started to carry her toward the water. Before they reached the water the victim started to kick and they dropped her. The defendant punched her and the two men again picked her up and carried her to the water. As Bilodeau walked away he saw the defendant strike the victim on the head twice with a tire iron, and he heard eight or nine more similar thumps.

The two men returned to the car and started to leave, with the defendant driving. The car became stuck in mud again and they were unable to get it out. The defendant then broke all of the windows of the car with the tire iron and tried to remove the rear registration plate but could not do so. As Bilodeau walked away from the scene he heard a couple of splashes. The defendant then joined him as they walked toward a highway. Before reaching the highway the defendant threw his keys away in a wooded area. On the highway they hitchhiked a ride to Holyoke and then each went home, Bilodeau arriving home at about midnight. About 1:00 A.M. on April 28, 1973, the Northampton police received a telephone report that the defendant's Ford station wagon had been stolen from a shopping center parking lot in that city between 9:45 and 9:50 P.M.

the previous evening. There is evidence that the defendant's mother made the call based on information which he gave her when he arrived home without the car.

Most of the evidence summarized to this point comes from two sources. One source is the testimony of police officers stating what the defendant told them in an oral confession after his arrest. The other source is the testimony of Bilodeau. Bilodeau was indicted for the same crimes charged against the defendant. He agreed to plead guilty to the crimes of murder in the second degree and assault with intent to commit rape, and then became a witness for the Commonwealth.

The defendant in testifying at his trial denied making most of the statements attributed to him by the police officers in describing his confession. He also denied much of the testimony of Bilodeau and testified that it was Bilodeau who was in the back seat of the car with the victim after they arrived at the Oxbow, that it was Bilodeau who attempted to rape the victim and who punched her and struck her with the tire iron, that it was Bilodeau who smashed all of the car windows with the tire iron, that it was Bilodeau who threw the tire iron and some cans of beer into the water, and that it was Bilodeau who asked that he help him throw the victim into the water after she was dead. The defendant also testified that he had tried to stop Bilodeau from attacking the victim, that Bilodeau had threatened to kill him if he touched him and he was afraid of Bilodeau, and that Bilodeau again threatened to kill him when, after they left the victim believing her to be dead, the defendant wanted to go back to help her. It is clear from their verdicts that the jurors did not believe the defendant's testimony attempting to exculpate himself.

About noon on April 28, 1973, three men who were fishing at the Oxbow discovered the body of the victim and the defendant's car. The police were notified, and they conducted an investigation which disclosed the following. The victim was lying face up with her feet in the water, and her clothing had been pulled up over her breasts and down

over her ankles. She had a shoe on one foot and her other shoe, her hat and her umbrella were found on the sand nearby. The defendant's car was located about eighty-three feet from the body with all of its windows shattered. The victim's pocketbook was found in the car. There were several human blood stains on the rear seat and floor of the car, the largest being about four inches by five inches in size. Samples from the larger stains were analyzed as human blood of Group A. The victim's blood was also found to be Group A. A tire iron was found under water about sixty-five feet out from shore, at a point between the locations of the body and the car. Examination by an expert revealed the presence of particles of pulverized glass on the tire iron. Broken glass from a wine bottle was found near the body, and a package of six unopened cans of "Budweiser" beer was found under water about ten feet from the body. The defendant and Bilodeau had purchased both of these items at a package store shortly before the victim entered the car.

The medical examiner for Hampshire County viewed the body of the victim before it was removed from the Oxbow area, and on the following day, April 29, 1973, he was present when an autopsy was performed on the body by Dr. George W. Curtis, who was a forensic pathologist and medical examiner of extensive experience. He described the many lacerations, contusions, abrasions and scrapings which he found by an examination of the exterior of the body. His description was in part as follows: "[O]n the back of the head I found it covered by many lacerations, many areas of splitting of the scalp. These covered what we call the parietal or central region of the skull, the occipital or back of the skull, and in the temporal regions. . . . Many of these are gaping, split wide open. Some of these were exposing bone." There was a "gaping laceration — that means it's wide," about five inches long, on the left side of the face running from the forehead down to the mouth. The contusions included some on the breasts and in the pelvic area. Parts of the body were checked for sperm and none was

seen. Dr. Curtis also made an internal examination of the body, including the refraction of the scalp, which disclosed many fractures of the skull.

In addition to describing the victim's body, and particularly the nature and location of the various contusions, lacerations, fractures and other injuries or conditions disclosed by the examination, Dr. Curtis made use of some black and white photographs and colored slides of the body. Some of these portrayed the genital area, and two of the slides showed the skull in its fractured condition when exposed by the refraction of the scalp. The photographs were shown to the jury, and the slides were projected on a screen and viewed by the jury when the doctor testified about them.

Dr. Curtis stated that it was his "opinion that [the victim] came to her death as a result of multiple blows to the head, with massive lacerations to the scalp and face, and multiple fractures of the skull," and that the injuries which he "observed in the head and body of [the victim] are consistent with what would be caused by striking with that tire iron" which was found in the water at the Oxbow as described earlier in this opinion.

The judge charged the jury fully on all aspects of the two cases against the defendant, and there is no contention that there were any errors in the charge. The charge included instructions on the criminal responsibility of the defendant for his own conduct and the conditions under which he might be found responsible for the conduct of Bilodeau under the theory of concerted action or joint venture. The judge instructed the jury that if they found that the defendant personally murdered the victim, or that Bilodeau murdered her under circumstances which made the defendant equally responsible therefor, they could then find the defendant guilty of murder in the first degree if the murder was committed (a) in the commission or attempted commission of the offense of rape, which offense is punishable by imprisonment for life, (b) with premeditated malice aforethought, or (c) with extreme atrocity

or cruelty. This instruction was in accordance with G. L. c. 265, § 1.

On indictment no. 10294 the jury found the defendant guilty as charged of the crime of assault with intent to commit rape and the judge sentenced him to the Massachusetts Correctional Institution at Walpole (MCI Walpole) for a term of not more than sixty nor less than forty-five years. On indictment no. 10295 the jury found the defendant guilty of the crime of "Murder in the First Degree, the killing being with extreme cruelty and atrocity," and the judge sentenced the defendant to imprisonment at MCI Walpole for the term of his natural life. The two sentences are to be served concurrently. We now consider the several legal issues which require our attention.

1. *Photographs and colored slides.* The defendant contends that it was an abuse of discretion and therefore error for the judge to admit in evidence twelve black and white photographs and to permit the projection of eight colored slides for viewing by the jury. Most of the photographs and all of the slides depict some part or all of the body of the victim. The contention of error is based on two grounds. One is that the oral testimony of various witnesses adequately described what was shown in the photographs and slides. The other is that the photographs and slides "were extremely graphic and highly sensational . . . [and a] gruesome portrayal of death," that they "could only cause the jury to arrive at an unwarranted sense of rebellion . . . [and] did not allow for a dispassionate and even tempered review by a jury." The defendant cannot prevail on either ground.

The defendant does not contend that the photographs and slides were not fair and accurate representations of factual conditions which the fact finders, in this case the jurors, were asked to find as the basis for their verdicts. In what was probably the earliest case to reach this court on the admissibility of photographic evidence, *Marcy* v. *Barnes,* 16 Gray 161 (1860), this court said (at 163-164): "Under proper precautions in relation to the preliminary

proof as to the exactness and accuracy of the copies pro-
duced by the art of the photographer, we are unable to
perceive any valid objection to the use of such prepared
representations . . . as evidence competent to be considered
and weighed by the jury." In *Blair* v. *Pelham,* 118 Mass.
420, 421-422 (1875), we again approved of the use of pho-
tographic evidence "to assist the jury in understanding the
case." The two basic issues for determination by the jury
in this case were whether the defendant assaulted the vic-
tim with intent to commit rape on her, and whether he
murdered her. The photographs and slides had probative
value on both issues by reason of what they portrayed.

This court has held without exception in a long line of
decisions that in a case such as the present one, involving
an indictment charging murder in the first degree which is
being tried on the basis, among others, that it was com-
mitted "with extreme atrocity or cruelty," photographs
and, in some cases, slides of the victim indicating the force
applied and portraying the injuries inflicted may properly
be admitted on the issue of "extreme atrocity or cruelty."
It will suffice to cite but a few of these decisions. *Common-
wealth* v. *Simpson, ante,* 119 (1976). *Commonwealth* v.
*Martin,* 357 Mass. 190, 192-193 (1970). *Commonwealth*
v. *Rogers,* 351 Mass. 522, 531, cert. denied, 389 U.S. 991
(1967). *Commonwealth* v. *Makarewicz,* 333 Mass. 575,
583-584 (1956). *Commonwealth* v. *McGarty,* 323 Mass.
435, 438-439 (1948). *Commonwealth* v. *Gray,* 314 Mass. 96,
97-98 (1943). *Commonwealth* v. *Sheppard,* 313 Mass. 590,
598-599, cert. denied, 320 U.S. 213 (1943). *Commonwealth*
v. *Osman,* 284 Mass. 421, 423 (1933). *Commonwealth* v.
*Knowlton,* 265 Mass. 382, 385-386 (1928).

We have also held in a long line of decisions that if pho-
tographs or colored slides of the victim of a homicide al-
leged to have been committed with "extreme atrocity or
cruelty" are otherwise admissible, they are not rendered
inadmissible solely because they are gruesome or may have
an inflammatory effect on the jury. In *Commonwealth* v.
*Rogers,* 351 Mass. 522, 531 (1967), we said: "There was
no error in admitting in evidence repulsive pictures of the

mutilated corpse, which left no gruesome detail of this macabre event to the imagination. The pictures were . . . relevant on the issue whether the homicide was committed with extreme atrocity and cruelty." In *Commonwealth* v. *McGarty*, 323 Mass. 435, 438 (1948), we said: "The third assignment of error was to the admission in evidence of photographs of the dead body of the girl, which showed her whole body, and not merely the head and neck to which was applied the force that caused death. The defendant's contention is that the sight of photographs showing the private parts of the girl, which had been torn and were covered with blood, would inflame the minds of the jury against the defendant. A similar contention has often been made in homicide cases, but it has never been sustained where the photographs had evidential value upon a material matter." In *Commonwealth* v. *Clark*, 292 Mass. 409, 410 (1935), we held that certain photographs of the body of the victim were competent evidence, and that they "were not rendered inadmissible by the possibility that they might excite an unreasoning prejudice against the defendant." Similar holdings may be found in *Commonwealth* v. *Lamoureux*, 348 Mass. 390, 392-393 (1965), and *Commonwealth* v. *Retkovitz*, 222 Mass. 245, 248-249 (1915).

The defendant's argument that the photographs and slides should not have been admitted in evidence because the witnesses had, or could, adequately describe everything shown on the photographs and slides is not novel. It has been advanced before, sometimes coupled with the further argument that the photographs and slides provided only cumulative evidence not essential to prove what was portrayed thereon, at other times coupled with an offer to stipulate to what is shown by the photographs and slides. We have invariably rejected such arguments. We did so very recently in *Commonwealth* v. *Sheeran, ante,* 82, 87 (1976), and *Commonwealth* v. *Torres,* 367 Mass. 737, 742 (1975). In *Commonwealth* v. *Chalifoux,* 362 Mass. 811, 817 (1973), in speaking about the admission of photographs of the victim of a severe beating but not a homicide, we said: "Although the point [that the injuries were

less compatible with a fall from a car than with a severe beating with a billy club] could be and was made by oral testimony, it was probably more effectively, because more graphically, demonstrated by the pictures, and it was open to the Commonwealth to proceed on that basis." In *Commonwealth* v. *Jones*, 319 Mass. 228, 229 (1946), we said: "It is not a valid objection to admissibility that the medical examiner had already testified in detail as to the wound and other conditions shown by the photographs." In *Commonwealth* v. *Osman*, 284 Mass. 421, 423 (1933), we said: "The defendant urges that the condition shown by the photographs could have been shown and in fact was shown by oral testimony. But the photographs described the condition of the body more vividly and accurately than could have been done by words. That condition was material, at least upon the question whether the crime was murder in the first degree because 'committed ... with extreme atrocity or cruelty.'" See *Commonwealth* v. *Robertson*, 162 Mass. 90, 93, 97 (1894). In *Commonwealth* v. *Stirling*, 351 Mass. 68, 71-72 (1966), we sustained the action of the trial judge who admitted photographs of the victim's body notwithstanding the defendant's objection that "they proved nothing which the defendant was not prepared to stipulate."

Counsel have cited no case in which this court has held that it is error to admit photographs or slides of the victim's body in the trial of an indictment charging an unlawful homicide by violence. On at least two occasions we have commented on the paucity, and perhaps the absence, of any such holding by this court. *Commonwealth* v. *Chalifoux*, 362 Mass. 811, 817 (1973). *Commonwealth* v. *McGarty*, 323 Mass. 435, 438 (1948). Nevertheless, undaunted by our repeated holdings that such evidence was properly admitted, defendants, or perhaps more correctly their counsel, continue to press appeals on this now well settled issue. Perhaps this persistence is encouraged by our frequent suggestions that the admissibility of such evidence is a matter within the sound discretion of the trial judge. If, indeed, the admissibility of such evidence depends to

any extent on the exercise of judicial discretion, it is obvious that a defendant who claims an abuse of that discretion assumes a heavy burden. That burden is not met by merely arguing that on a debatable question of admissibility the judge ruled against the defendant while another judge could and might have ruled in his favor. On appellate review of a claim of an abuse of discretion by a trial judge, "[t]he question is not whether we ... should have made an opposite decision from that made by the trial judge. To sustain ... [the claim] it is necessary to decide that no conscientious judge, acting intelligently, could honestly have taken the view expressed by him." *Davis* v. *Boston Elevated Ry.*, 235 Mass. 482, 502 (1920). *Long* v. *George*, 296 Mass. 574, 578-579 (1937).

It is clear in this case that there was no abuse of discretion and no other error by the trial judge in admitting the disputed photographs and colored slides in evidence.

2. *Defendant's oral confession.* About 5:25 P.M. on Saturday, April 28, 1973, the day the body of the victim was found at the Oxbow, the defendant and his stepfather, James Hutchinson, arrived at the Northampton police station, and Northampton police officer Richard Ryan and State police detective lieutenant George W. Powers, both of whom were working on the case, were called by radio. They returned to the station, introduced themselves to the defendant, and advised him fully of his constitutional rights as required by the decision in *Miranda* v. *Arizona,* 384 U.S. 436 (1966). They then asked the defendant whether he understood his rights and he said that he did. The defendant raises no question about the accuracy or completeness of the statement of rights made by the officers to the defendant, nor does he contend that he did not understand the statement or his rights as thus described to him.

After the defendant had been advised of his constitutional rights and he had acknowledged that he understood them, the officers started to question him about events of the previous evening. At first the questioning was limited to his claim that his car had been stolen from a shopping

center parking lot in Northampton. When they were not satisfied or convinced by the defendant's answers on that subject, the officers told him they did not believe he was telling the truth. They also told him about finding his car and the body of the victim at the Oxbow and that they thought he was somehow mixed up in the matter, and asked him to tell them the truth. The defendant became excited, said that if he told them the truth they would put him in jail for life, and asked to be allowed to talk to his stepfather after which he would tell them the whole story. The stepfather was brought in and the defendant said to him "I'm sorry, Jimmy, I'm sorry, Jimmy" and he started pounding the table or desk. His stepfather asked "[W]ell, what did you do?" The defendant said "I killed her, I killed her. . . . I hit her, I hit her. I didn't mean to. I was in the mood for love, and it happened." His stepfather then said "[J]ust tell the truth, Henry. We'll stick by you. . . . [Y]ou're going to have to tell the cops everything. Tell them the truth. The best thing for you to do, Henry, would be to tell them the whole truth." About this time the defendant became very upset and got down on his knees and hugged his stepfather who quieted him down. The stepfather then left the room to tell the defendant's mother, who was sitting in a car outside, what had happened. All of this had occurred between 5:25 and about 5:50 or 5:55 P.M.

The police officers then resumed their questioning of the defendant and according to the testimony of the officers the defendant made many admissions which we summarize on the basis of that testimony. On the ride from Amherst to Northampton the defendant got into the back seat with the victim and made some physical advances toward her. When the car made a turn indicating that it was not going to Smith College the victim started struggling and screaming, the defendant hit her twice in the face with his fist, and his "head got numb." In answer to questions about sexual acts by him he became upset, yelled, got down on his knees and said "I'll go to her grave. I'll put flowers on her grave. I'll tell her I'm sorry." He admitted no sexual

advances or assaults on the victim. He helped Bilodeau carry the victim down to the water and when she started to stir he went to the car, got the tire iron and hit her twice. He then tried to drive the car away from the scene but it became stuck in the mud. He used the tire iron to smash all the windows to make it look like the car had been stolen and then threw the tire iron and some cans of beer in the water. Lieutenant Powers asked him why he killed the girl and he said "I had to, what else — she'd know us. . . ." At that point, which was about 7:00 P.M., Lieutenant Powers informed the defendant that he was under arrest. Later, in his own testimony, the defendant denied having made these admissions to the police officers.

The defendant became very agitated and excited when told he was under arrest, and the police officers called a doctor who was also the medical examiner. The doctor arrived about 8:00 P.M., examined the defendant and found him "upset," "nervous, fidgety," and he prescribed "Seconal . . . a mild sedative" for him to take. He testified that Seconal would not impair the defendant's mental faculties.

The police officers further testified that the defendant offered to go to Amherst and show them the route which he and Bilodeau had taken on the previous evening just before and after the victim entered their car until they arrived at the Oxbow. The officers and the defendant took that route starting about 9:15 P.M. with the defendant pointing out significant stops and turns until the car arrived at the Oxbow.

When the prosecution first offered the testimony of the police officers about the defendant's statements the defendant objected. The judge excused the jurors and conducted a voir dire hearing on the admissibility of the evidence. The police officers, Ryan and Powers, were the only witnesses at the hearing. After the conclusion of the hearing, the judge took the matter under advisement, and on the next day he found and ruled thereon as follows in open court in the absence of the jury: "I find that the defendant was advised of his rights and aware of his rights, and willingly, freely, knowingly, and intelligently made the statement to

the police; that it was voluntary in every sense of the word, that it was particularly in response — not particularly to questions by a police officer that he acknowledged participation, but rather in response to advice and a question by his stepfather — according to the evidence that came in."

The judge then admitted testimony of the defendant's statements to the police officers and, in accordance with the long established procedure in this Commonwealth, he instructed the jury that notwithstanding his preliminary decision admitting the testimony the jury had the ultimate responsibility to determine whether the statements were voluntary before giving them any effect in arriving at their verdicts. *Commonwealth* v. *White,* 353 Mass. 409, 417-418 (1967), cert. denied, 391 U.S. 968 (1968). *Commonwealth* v. *Valcourt,* 333 Mass. 706, 710 (1956). *Commonwealth* v. *Makarewicz,* 333 Mass. 575, 585 (1956). *Commonwealth* v. *Sheppard,* 313 Mass. 590, 604, cert. denied, 320 U.S. 213 (1943). *Jackson* v. *Denno,* 378 U.S. 368 (1964).

The defendant urges us to reverse the trial judge and hold that he erred in concluding at the voir dire that the Commonwealth had sustained its burden of proving the statements to be voluntary. On the contrary, having examined the transcript, we think the evidence was so strong for a finding of voluntariness, and the trial judge's conclusion so well supported, that there is no occasion to explore again the question of the exact extent of the review which this court should give such determinations by trial judges, a question that was considered at some length in *Commonwealth* v. *Mahnke,* 368 Mass. 662 (1975), cert. denied, 425 U.S. 959 (1976).

It is argued in the defendant's brief that there are "some similarities" in his case to the recent case of *Commonwealth* v. *Daniels,* 366 Mass. 601 (1975), in the matter of the admission of a confession. In the present case there was evidence, not at the voir dire hearing but much later when the defendant testified, that he spent over eight years in the public schools, all of that time in a "special class school." We may assume from that later evidence that the defendant had some learning problems, but we do not know

their nature or extent. By contrast, the defendant in the *Daniels* case is described as "a mentally retarded young man with a second-grade reading ability and an I. Q. of fifty-three, . . . found guilty of murder in the second degree solely on the basis of his confession to the Springfield police," and who had spent more than half of his twenty-six years in a State school for the retarded from which he was released about two years before the date of the crime charged against him. 366 Mass. at 602-603. The defendant in the present case had no mental deficiency of such extent. In any event, even in the *Daniels* case we did not hold that the trial judge erred in admitting Daniels's confession, although we gave relief under G. L. c. 278, § 33E.

The *Daniels* opinion includes a lengthy collection of many decisions of this and other courts dealing with the subject of inculpatory statements made by defendants having a diminished or subnormal mental capacity and we need not repeat them here. We hold that there was nothing in the evidence before the judge at the voir dire hearing on the admissibility of the defendant's statements which required the judge to exclude them on the basis of the defendant's present claim of his diminished mental capacity when the statements were made.

3. *Review under G. L. c. 278, § 33E.* On the indictment charging the defendant with murder in the first degree we have considered the whole case on both the law and the evidence as required by G. L. c. 278, § 33E, and we conclude that the verdict was neither against the law nor against the evidence and that the interests of justice require neither a new trial nor the entry of a verdict of a lesser degree of guilt than that found by the jury.

*Judgments affirmed on*
*both indictments.*