COMMONWEALTH vs. PAUL A. RAMOS.

Middlesex. December 4, 1989. - January 9, 1990.

Present: LIACOS, C.J., ABRAMS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Homicide. Jury and Jurors. Constitutional Law*, Jury. *Evidence*, Photograph.

A criminal defendant's contention that he was denied his right to a jury drawn from a fair and reasonable cross section of the community was not properly presented in compliance with Mass. R. Crim. P. 13 (a) (1) & (2) and Mass. R. Crim. P. 20 (a), and, moreover, was not supported by the record of his trial. [405-406]

At the trial of an indictment for first degree murder, the judge acted within his discretion in admitting in evidence certain photographs of the defendant's automobile and of the victim's body. [406-407]

At a murder trial, the evidence was sufficient to warrant a verdict of guilty of murder in the first degree on the alternative theories of deliberately premeditated malice aforethought and extreme atrocity or cruelty. [407-408]

INDICTMENT found and returned in the Superior Court Department on October 3, 1985.

The case was tried before *Robert W. Banks*, J.

*Robert P. Reardon* for the defendant.

*Pamela L. Hunt*, Assistant District Attorney, for the Commonwealth.

NOLAN, J. On April 9, 1986, the defendant, Paul A. Ramos, was convicted of murder in the first degree on the grounds of deliberate premeditation and extreme atrocity or cruelty. The defendant appeals to this court, claiming (1) that he was denied his right to a jury drawn from a fair cross section of the community; (2) that the trial judge erred in admitting in evidence certain photographs of the victim and of the defendant's automobile; and (3) that there was insufficient evidence to sustain the conviction. In addition, the de-

fendant requests that we grant relief pursuant to our power under G. L. c. 278, § 33E. Finding neither error nor an occasion to exercise our power under G. L. c. 278, § 33E, we affirm.

From the evidence presented by the Commonwealth at trial, the jury could have found the following facts. At 1:30 A.M. on September 12, 1985, a Carlisle police officer, Dale Schofield, patrolling alone, was driving south on Lowell Street toward Carlisle center. The defendant's automobile turned out of Litchfield Drive and onto Lowell Street cutting off the officer's cruiser and forcing her to stop. The officer observed that the defendant's automobile appeared to have been in an accident. The front grille appeared to be broken and a leafy branch was sticking out of the front end. After the automobile completed its turn, the officer pulled into Litchfield Drive in order to turn around and follow the car. As she was turning around, the officer noticed a small fire approximately one hundred feet down Litchfield Drive, about ten to fifteen feet off the roadway. The officer turned on her revolving blue lights and pursued the defendant's automobile. The officer could clearly read the automobile's registration plate and observed that inside there was only the defendant. After being followed for approximately eight-tenths of a mile, the defendant stopped. Officer Schofield exited her cruiser with her flashlight and approached the defendant's automobile on the driver's side. As she approached the automobile, the officer noticed blood on the back of it. As she neared the driver's door, she noticed blood across the back of the defendant's shirt. She also observed that the defendant's hands, on the steering wheel, were bloodied. The officer told the defendant to put his automobile in park and to produce his license and registration. The license and registration identified the defendant, Paul A. Ramos, as the driver and owner of the automobile. Upon being asked the source of the blood, the defendant stated that he "had an accident back there." The officer observed that the defendant's clothes were disheveled. His shirt was unbuttoned, partially untucked, and smeared with blood on the front, back, and sleeves. His belt

was unbuckled. The top of his pants was unfastened and his pants were unzipped about three inches. The interior of the defendant's automobile appeared to be in disarray. There were items tossed on the front seat and on the floor of the passenger seat. The officer observed that there was a great deal of blood in the automobile; there was blood on the passenger's front seat and on the console between the two front bucket seats.

Shortly thereafter, Schofield's "backup," Officer Keith Gearin, arrived. When Schofield asked him whether he had seen the fire on Litchfield Drive, Gearin proceeded to Litchfield Drive. Within minutes Gearin called the dispatcher. Upon hearing this call, Schofield took out her revolver and requested another backup.[1] When the backup arrived, she instructed the defendant to put his hands outside the automobile. Schofield further checked the interior of the defendant's automobile. She noticed a purse and its scattered contents and a bottle of transmission fluid on the floor of the passenger side.

The defendant was handcuffed and seated in the rear of Officer Schofield's cruiser. He was taken to the Carlisle police station and then to the State police barracks in Concord. There was no conversation during the trip. Once inside the barracks, Carlisle police Chief David Galvin officially informed the defendant that he was under arrest for murder and advised the defendant of his rights. Chief Galvin then went to Litchfield Drive where he met several State troopers.

The State police took over the investigation but were assisted by the local officers. At the scene, the officers noticed, among other things, that many small saplings near the body were knocked down and large amounts of blood had splattered on the surrounding foliage. The officers also observed and photographed several tire marks. The officers spoke with a Litchfield Drive resident who stated that he had been

---

[1] About one hundred feet down Litchfield Drive from Lowell Street, and about ten feet off the roadway, was the body of a woman. She lay on her back, parallel to Litchfield Drive. Portions of her body had been burned. There was a severe laceration to her neck and to the right side of her face.

awakened at 1:06 A.M., by a woman's calling for help. He then heard the sound of tires spinning for three to five seconds. Some time later he heard the sound of "metal on metal." After a pause, he heard the sound of an automobile driving away toward Lowell Street at a high rate of speed.

After photographing and securing the scene at Litchfield Drive, the officers proceeded to the location of the defendant's car which was parked on Lowell Street. They observed numerous reddish-brown stains on the exterior of the automobile. Hair was observed on the front bumper guard. One trooper removed a large, leafy branch from the place where the grille would have been. This branch was later determined to match the remnant of a broken sapling near the location of the body. The car was then towed to the Concord barracks.

At the barracks, the defendant was booked and processed. A chemist tested the defendant's hands for the presence of blood. Each of the defendant's ten fingers and the backs and palms of his hands tested positive. His clothes were taken and later tested. His T-shirt was stained with type B blood, the victim's type. The sleeves, the front, and the top of the back of his dress shirt were also stained with the victim's type blood. His pants had blood on the front leg, zipper, and the pocket area. His belt tested positive for blood on both ends.

Shortly after 6 A.M., two State troopers interviewed the defendant.[2] The defendant stated that he had known the victim previously but did not know her name. He said that she came up to him on Massachusetts Avenue in Cambridge while he was making a telephone call and asked him for a "fix." He then gave her and two white men from Somerville[3] a ride to

---

[2]Before trial, the defendant filed a motion to suppress his statements. This motion was withdrawn after an agreement was reached among counsel, with the defendant's consent, that an edited version would be admitted without objection. The voluntariness of the statement was not made a live issue at trial.

[3]These two men were eventually identified as John Dever and Michael Kerivan. Both men testified at trial.

a place in Cambridge where he had previously taken her to buy drugs. She got out and returned with three packs of cocaine. He then drove on Massachusetts Avenue toward Arlington. One of the men (John Dever) departed from the vehicle on the way to Arlington Heights where he had earlier parked his white Ford pickup truck. The others kept going. The victim was in the passenger seat, and the remaining man (Kerivan) was behind her. The victim and Kerivan got "high" on cocaine. The defendant said that he had been drinking heavily all evening.

According to the defendant, the other man, whose name the defendant did not know, killed the victim while the defendant was driving. The other man then told the defendant to get rid of the body. The man left the defendant's automobile, took the defendant's keys, got transmission fluid from the trunk, and gave it to the defendant. He told the defendant to clean up and get rid of the body, and then he left, presumably on foot,[4] saying that he would call later.

The defendant then drove for five more minutes looking for a place to dump the body. He took the body out of the car. He was quite sure that she was dead. As he was dragging her out of the automobile, he could tell that she had been killed with a razor because he had been a barber. He did not know where the razor was. He poured the transmission fluid on her and lit her with book matches. He admitted that he may have hit her with his car; he was in a hurry to leave. He said that his pants were unbuckled because they were too tight.[5]

The defendant then consented to a search of his automobile.[6] Experts tested the interior and exterior of the automobile for blood. Much of the exterior of the automobile tested

[4]In traveling to the Lowell Street and Litchfield Drive area of Carlisle from various directions, none of the officers saw any pedestrians or hitchhikers.

[5]The defendant said he had a thirty-six inch waist. The defendant's pants were size "thirty-six xx."

[6]Notwithstanding the defendant's consent, the troopers obtained a search warrant for the automobile before searching it.

positive for blood: the front bumper, the under portion of the bumper, bumperette, front registration plate, passenger side mirror, rear window, passenger side wheel area, passenger side rear quarter panel, and rear bumper area. Heavy stains underneath the automobile in the front axle area tested positive for blood. Much of the interior of the automobile also tested positive for blood: the front passenger door jamb, dashboard, glove compartment, windshield, front seat, console, passenger floor, and items on the floor and the right side of the driver's seat. Extracts of the blood taken from the front bumper, rear bumper, inside the passenger door, and the console were analyzed and determined to be of the victim's blood type.

The troopers also found an empty bottle of transmission fluid on the floor of the passenger side. The bloody fingerprint of the defendant's left middle finger was clearly visible on the bottle. The only item in the glove compartment was an empty box for a "Morris Special Razor, sculptured edge." The razor itself was discovered on October 25, 1985, after a second search warrant was obtained for the automobile. During this second search, a white Morris sculptured edge razor, stained with blood, was found underneath the console. The victim's neck and facial wounds were consistent with wounds which would be caused by a razor of this type.

An autopsy conducted on the body disclosed that the victim suffered multiple incised wounds, fractures, contusions, abrasions, and burns. Her neck was cut from the right side to the left. The cut was six inches long by three-quarters of an inch wide and caused hemorrhaging into the surrounding tissues, tore muscles, and cut the left jugular vein. A triangular-shaped incised wound extended from her right eye to her right ear. This cut was four inches long by one inch wide. Both of the victim's hands were cut in numerous places.

Additionally, the autopsy revealed that the victim's first four ribs were fractured on the right side. There were three fractured ribs on the left side. Her pelvis was fractured in three places and her clavicle was fractured in two places. Her shoulder was wounded by enough force to separate the

skin from the bone. The first cervical vertebra was fractured and dislocated, severing the spinal cord and separating the head from the neck. Hemorrhaging surrounded the area of each of the fractures, an indication that the victim was alive when she suffered the fractures.

The victim also had several fresh abrasions and contusions over her face, neck, shoulder, chest, back, thigh, and leg. Areas of her abdomen, thigh, and groin had fourth degree burns. Her face, chest, and left arm were also burned.

The medical examiner testified that the victim would have been capable of walking around after the infliction of the neck and face wounds. She would have died from those injuries alone within one-half to three-quarters of an hour. She would have died from the fractures of the ribs and pelvis alone within three to four hours, and would have died within one to two minutes after the fracture of the first cervical vertebra.

The medical examiner further testified that the victim was alive when she suffered the cuts to her face and neck and when she suffered the fractures. The incised wounds of the face and neck, the fracture, and the burning were all contributing causes of death.

An expert in crime scene reconstruction and blood pattern analysis reviewed photographs of the automobile as well as some of the physical evidence in the case. From his opinions the jury could conclude that the victim had been sitting in the front passenger seat of the defendant's automobile, facing the windshield, when a right to left movement, coming from the defendant, caused the victim to begin bleeding heavily. Still bleeding heavily and still alive, the victim left the automobile by the front passenger door and walked toward the rear of the automobile spurting blood and contacting various parts of the car. The victim remained upright as she moved at a forward angle across Litchfield Drive.[7] The

[7]The blood spatters on the road, the expert opined, were inconsistent with having been made by someone carrying a bleeding body.

defendant's automobile ran over her while her blood was still liquid, contacting vegetation in the area as it did so.

John Dever testified that he was at the "99" Restaurant in Woburn on the night of September 11, 1985, when he met the victim. He had not seen her for some time. The two conversed and then drove toward the Green Parrot Lounge in Cambridge together in Dever's white pickup truck. Because he had been drinking and because he had both a headlight and a taillight out on the truck, Dever took back roads and parked the truck in Arlington. He and the victim then hired a taxicab to take them to the Green Parrot Lounge. At the Green Parrot Lounge, the victim met Michael Kerivan. At approximately 11 P.M., Dever left the lounge to use the public telephone across the street. The victim and Michael Kerivan followed. The defendant was using the public telephone, and the victim spoke with the defendant. The three were offered a ride by the defendant. They went to the defendant's auto- mobile. The victim seated herself on the front passenger side. Dever and Kerivan sat in the back, Kerivan on the rear driver's side. The defendant drove. After driving to Cam- bridge they drove back to Arlington Heights to the place where Dever had parked his truck. Dever and Kerivan got out. Dever gave Kerivan a ride home and then went home himself. The victim did not get out of the automobile, but remained with the defendant. Kerivan's testimony at trial was consistent with Dever's testimony except that Kerivan remembered that the four had stopped at a building in Cam- bridge which the victim entered, perhaps to buy cocaine.

The defendant testified at trial. His defense, in essence, was that, although Dever got out of the defendant's automo- bile in Arlington Heights, Kerivan remained in the car with the defendant and the victim. The defendant continued driv- ing with the victim in the front passenger seat and Kerivan sitting directly behind her. After approximately one-half hour, the victim and Kerivan began to argue about drugs. Then, according to the defendant, Kerivan grabbed the vic- tim around the neck and blood started going "everywhere." The defendant had to stop the automobile for a moment be-

cause the victim was falling toward him and getting blood all
over him. The defendant continued driving until Kerivan told
him to turn off into Litchfield Drive. The defendant did so
and stopped on Litchfield Drive. Kerivan got out and asked
the defendant if he had anything that would burn. The de-
fendant refused to help Kerivan but informed him that there
was transmission fluid and antifreeze in the trunk. The de-
fendant then handed Kerivan the car keys. The defendant
exited the car, walked down an embankment and vomited.
He saw Kerivan remove the victim's body and carry it across
the road. He never saw Kerivan or his car keys again and did
not notice any fire. After he finished vomiting, he noticed
that his car had been moved to the other side of Litchfield
Drive and was now facing Lowell Street. He retrieved his
spare keys from his wallet and left the scene, intending to go
home.

1. *Racial composition of the venire.* The defendant, who is
black, contends that the presence of only one black person in
the venire deprived him of the right to a jury drawn from a
fair and reasonable cross section of the community. Nothing
in the record indicates a violation of the statute (set forth in
the margin)[8] which governs the random selection of jurors.
Thus, the defendant has not met his burden.

"In order to establish a prima facie violation of the fair-
cross-section requirement, the defendant must show (1) that
the group alleged to be excluded is a 'distinctive' group in the
community; (2) that the representation of this group in

---

[8]General Laws c. 234A, § 3 (1988 ed.), provides: "Juror service in the
participating counties shall be a duty which every person who qualifies
under this chapter shall perform when selected. All persons selected for
juror service on grand and trial juries shall be selected at random from the
population of the judicial district in which they reside. All persons shall
have equal opportunity to be considered for juror service. All persons shall
serve as jurors when selected and summoned for that purpose except as
hereinafter provided. No person shall be exempted or excluded from serv-
ing as a grand or trial juror because of race, color, religion, sex, national
origin, economic status, or occupation. Physically handicapped persons
shall serve except where the court finds such service is not feasible. The
court shall strictly enforce the provisions of this section."

venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren* v. *Missouri*, 439 U.S. 357, 364 (1979). *Commonwealth* v. *Samuel*, 398 Mass. 93, 94 (1986). *Commonwealth* v. *Pope*, 392 Mass. 493, 500 (1984).

The defendant has not complied with the requirements of Mass. R. Crim. P. 13 (a) (1) and (2), 378 Mass. 871 (1979), and Mass. R. Crim. P. 20 (a), 378 Mass. 889 (1979), to raise this issue. Hence, the issue is not properly before us. *Commonwealth* v. *Samuel, supra* at 94-95. *Commonwealth* v. *DeArmas*, 397 Mass. 167, 169 (1986). *Commonwealth* v. *Pope, supra* at 498, and cases cited. We pause to note that the record contains no evidence to support the defendant's claims under the Federal or State Constitutions. See *Duren* v. *Missouri, supra* at 357; *Commonwealth* v. *Williams*, 378 Mass. 217, 221-222 (1979); *Commonwealth* v. *Peters*, 372 Mass. 319, 322-323 (1977).

2. *Photographs.* The defendant next contends that it was an abuse of discretion and therefore error for the judge to admit in evidence certain photographs of the defendant's automobile and of the victim. The defendant contends that the photographs of the defendant's motor vehicle were prejudicial because the photographs were duplicative and because the jurors were afforded an opportunity to view the automobile. The defendant contends that the photographs of the victim were prejudicial and added nothing material to the case.[9] We reject the defendant's contention that it was error to admit the photographs.

It is well settled in a case such as the present one, in which the defendant is accused of committing murder with extreme atrocity or cruelty and with premeditation and deliberation, that photographs indicating the force applied and portraying

---

[9]The defendant also objects to the photographs of the victim on the basis that a white chemical powder (which Officer Gearin had apparently used to extinguish the fire) appeared on portions of the body.

the injuries inflicted may properly be admitted on the issue of whether the murder was committed with extreme atrocity or cruelty, as well as on the issue of premeditation and deliberation. *Commonwealth* v. *Bys*, 370 Mass. 350, 358 (1976), and cases cited (extreme atrocity or cruelty). *Commonwealth* v. *Sielicki*, 391 Mass. 377, 382 (1984) (premeditation and extreme atrocity). It is also well settled that, if the photographs possess evidential value on a material matter, they "are not rendered inadmissible solely because they are gruesome or may have an inflammatory effect on the jury." *Commonwealth* v. *Bys*, *supra*. *Commonwealth* v. *Rogers*, 351 Mass. 522, 531 (1967).

Whether the photographs were "so inflammatory in nature as to outweigh [their] probative value and preclude [their] admission is a question to be determined by the trial judge in the exercise of his sound discretion." *Commonwealth* v. *D'Agostino*, 344 Mass. 276, 279 (1962). "It is not a valid objection to admissibility that the medical examiner had already testified in detail as to the wound and other conditions shown by the photographs." *Commonwealth* v. *Bys*, *supra* at 360, quoting *Commonwealth* v. *Jones*, 319 Mass. 228, 229 (1946). We reject the defendant's contention that it was error to admit the photographs of the victim. The Commonwealth had the right to prove its case. There was no abuse of discretion.

Further, we reject the defendant's contention that the duplicative nature of the photographs of the defendant's automobile rendered them inadmissible. See *Commonwealth* v. *Bys*, *supra* at 359 (the fact that evidence is cumulative does not render it inadmissible). The defendant's automobile was the initial scene of the crime. The photographs depicting the condition and contents of the automobile were relevant to the jury's understanding of what occurred. There was no error.

3. *Sufficiency of evidence.* The Commonwealth presented evidence which, if believed, proved that the defendant slashed the victim's throat, inflicted numerous facial wounds with a razor, ran over her with his automobile, and then doused her with transmission fluid and set her on fire.

The Commonwealth's evidence speaks for itself. There was sufficient evidence, read in the light most favorable to the Commonwealth, to warrant a finding of murder in the first degree on the grounds of deliberate premeditation and extreme atrocity or cruelty.

4. *G. L. c. 278, § 33E.* We have reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, and conclude that this case presents no occasion for the exercise of our authority under that statute. We affirm the conviction.

*Judgment affirmed.*