COMMONWEALTH *vs.* BRUCE BLAKE.

Barnstable. November 5, 1990. - January 15, 1991.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & GREANEY, JJ.

*Homicide. Practice, Criminal*, Instructions to jury, Offer of proof, Conduct of prosecutor, Argument by prosecutor, Indictment. *Intent. Malice. Intoxication. Insanity. Self-Defense. Evidence*, Expert opinion, Offer of proof, Photograph. *Constitutional Law*, Assistance of counsel.

At the trial of indictments for first degree murder and arson of a motor vehicle no error appeared in the judge's instructions on the elements of malice and intent and the Commonwealth's burden of proof. [149-154]

The judge at a first degree murder trial correctly refused to instruct the jury to consider the effect of the defendant's intoxication on his ability to have formed general intent. [155-156]

A criminal defendant was not entitled to an instruction under *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967), where there was no basis in the evidence at trial for such an instruction, even if it had been requested. [156-158]

A criminal defendant was not entitled to an instruction on the use of excessive force in self-defense as a mitigation of murder to manslaughter, where there was no basis in the evidence for such an instruction, even if it had been requested. [158]

At the trial of a murder indictment there was no error demonstrated in the judge's sustaining the prosecutor's objection to a question posed to the defendant's medical expert, where there was no offer of proof and, in any event, the question was overbroad and confusing. [158-159]

At a murder trial, any error in admitting in evidence a photograph of the victim in life was nonprejudicial in light of other testimony about the victim, extensive evidence showing the victim's injuries, and the overwhelming evidence of guilt. [159-160]

At a murder trial, eleven photographs of the victim's body were properly admitted, in the judge's discretion, as relevant on the issues of extreme atrocity or cruelty and deliberate premeditation. [160]

At a criminal trial, the prosecutor properly argued the fair inferences that could be drawn from the evidence offered by the defendant. [160-162]

A criminal defendant was not deprived of effective assistance of counsel by reason of his attorney's not pursuing certain theoretical defenses that could not be supported by evidence [162]; and defense counsel's han-

dling of the direct examination of the defense psychiatrist did not deprive the defendant of a substantial ground of defense [162-163].

A first degree murder indictment and verdict based on extreme atrocity or cruelty are not unconstitutionally vague or violative of a defendant's due process rights (*Commonwealth* v. *Freiberg*, 405 Mass. 282, 289-290, cert. denied, 493 U.S. 940 [1989]). [163]

INDICTMENTS found and returned in the Superior Court Department on January 4, 1988.

The cases were tried before *Elizabeth J. Dolan*, J.

*Thomas T. Merrigan* for the defendant.

*Thomas M. Yonce*, Special Assistant District Attorney, for the Commonwealth.

LYNCH, J. After a jury trial in the Superior Court, the defendant was convicted of murder in the first degree by reason of extreme atrocity or cruelty, and arson of a motor vehicle. On appeal, the defendant contends the trial judge's instructions erred in several respects, including: (a) improperly shifting the burden of proof for the element of malice; (b) prohibiting the jury from considering the effect of intoxication on the defendant's ability to form general intent; and (c) failing to instruct the jury, sua sponte, on the defenses of lack of criminal responsibility and self-defense. The defendant also contends the trial judge erred in excluding expert testimony concerning the defendant's inability due to intoxication to form the requisite criminal intent, and in admitting certain photographs of the victim. Further, the defendant contends that: the prosecutor engaged in improper cross-examination and closing argument; his indictment and conviction for murder in the first degree based upon extreme atrocity or cruelty violated his State and Federal constitutional right to due process as the term is unconstitutionally vague; he was denied effective assistance of counsel; and that he is entitled to reversal or reduction of the verdict under G. L. c. 278, § 33E (1988 ed.). We uphold the defendant's convictions on both the murder and the arson charge and see no reason to exercise our power under G. L. c. 278, § 33E.

On December 26, 1987, the defendant, Blake, spent the evening at a lounge bar in Hyannis. According to the defendant, he consumed at least twenty beers and a gram of cocaine at the bar. Employees of the bar testified he did not appear to be drunk or "out of hand."

At closing time, the defendant asked the victim for a ride home, and she agreed. When they arrived at the defendant's apartment, they went inside and smoked marihuana in his living room. The defendant also drank beer and ingested cocaine.

The defendant testified to the following scenario: As he and the victim were in his bedroom starting to have intercourse, the victim yelled that she should not be there, that she had a boyfriend, and she began scratching him. She went into the living room to put her clothes back on. When the defendant followed her into the living room "to see what was wrong" and attempted to kiss her, she started scratching and hitting him. The defendant hit her, and she fell on the floor, her face bleeding. The defendant "freaked out." According to the defendant, after the victim fell she was not breathing.

From this point on, the defendant's recollection became spotty. The evidence showed that the victim was severely beaten on eight different areas of the head and face; beaten on her shoulders and body; stabbed in the face, the head, and the back; and strangled. The medical examiner testified that all these injuries were inflicted while the victim was still alive, and that the nature of her injuries indicated defensive actions on her part. After she was dead, part of her body was burned. At some point before this was over the defendant dragged the victim downstairs to her car, drove thirteen miles down the highway, and then dragged her sixty feet into the woods off the highway.

The defendant recalled driving with the victim in the back seat, and recalled kicking the victim's face when he was in the woods. He told a police officer he had kicked her face "so that no one would recognize her." He also said that when he was walking away, he thought he heard her groan or make another noise. After leaving the victim in the woods, the de-

fendant also recalled driving "all the way down the highway off Cape . . . driving and driving, thinking [about] what I should do." He then got a container of gas, drove to a parking lot near his apartment and set the victim's car on fire, with her clothes in it. Blake testified he set the car on fire "[b]ecause I knew I had to pay for what I have done."

The defendant then returned to his apartment, cleaned it, and threw his bloody clothes in a dumpster. Sometime that morning he encountered his neighbor and asked if he had been too loud the night before. The defendant said nothing about the incident to the people he saw that Sunday, December 27.

On Monday morning the defendant told his employer about the incident. The employer contacted the police.[1] After talking to family members, the defendant turned himself in to the police, and admitted killing the victim and setting her car on fire. He tried to describe the location where he had left the body.

The police found the victim in the woods, her head lying in a crater full of blood, and she was wearing only a bra. In the defendant's apartment, along with blood and hair consistent with the victim's, the police found a knife with blood on it in a dish of soapy water in the kitchen.[2]

I. *Jury Instructions.*

a. *Sandstrom error:*

The defendant claims the trial judge's charge to the jury on general intent contained the constitutional error prohibited in *Sandstrom* v. *Montana*, 442 U.S. 510 (1979). That is, he claims, the instructions " 'reliev[ed] the [Commonwealth] of the burden of proof . . . on the critical question of . . . state of mind,' . . . by creating a mandatory presumption of intent upon proof by the [Commonwealth] of other elements

---

[1] The police had found the victim's car and initiated a search for her the previous day.

[2] The investigating officers did not find any physical evidence of the victim's presence in the bedroom. Also found with the body was the victim's jacket, which had been set on fire. The jacket had a one-inch wide cut in the back. The victim had a one-inch wide stab wound on the lower back.

of the offense." *Francis* v. *Franklin*, 471 U.S. 307, 313 (1985), quoting *Sandstrom, supra* at 521. See *Commonwealth* v. *Nieves*, 394 Mass. 355, 359 (1985).

We set out the challenged language in the context in which it appears, and refer to other relevant portions of the charge in our discussion below.

Directly preceding her instructions on intent, the judge gave a lengthy, exemplary charge on circumstantial evidence and the drawing of reasonable inferences. The judge began her instructions on intent by linking that explanation of inferences to the concept of intent, as follows:

> "Circumstantial evidence is just as valuable as direct evidence provided that it is based upon a reasonable inference. In most instances in trials, the element of intent is shown in its evidentiary sense usually by reasonable inference, and I'm going to be using the term intent as we get into the elements of the case."

Since intent is in someone else's mind, she continued, it can usually be ascertained only by the external, visible circumstances. Repeating that "the necessary element of intent is usually shown . . . by reasonable inference," she added,

> "Intent may be inferred from all of the circumstances; what was said, if anything, what was done, what was taking place at that time. By evaluation of the facts and circumstances and weighing the same against your common judgment and experience, an inference can be drawn as to whether or not the requisite intent was present."

The judge then pointed out that the jury must be able to distinguish between two types of intent, general and specific intent. In beginning her description of general intent, the judge used the challenged language, set out below:

> "A general intent is a purpose of mind, something that we all exercise when we *decide* to do a certain thing.

But usually it's not the subject of direct contemplation for any appreciable period of time, because *it's said* that everyone is presumed to intend to do what he in fact did. That type of intent, that general intent, when we do these things, many times, is present only unconsciously, we call it general intent" (emphasis added).

At this point the judge gave a long, accurate explanation of the difference between general and specific intent, centering on the distinction between focused (specific) and unfocused (general) purpose. She described general intent as the state of mind you are in when "[Y]ou go through a host of things in life as having a *purpose* to do them, you're not focusing and concentrating on that particular *purpose*" (emphasis added). She gave several clear, proper examples to illustrate this concept.

The defendant claims that, by instructing the jury that one of the forms of malice required only general intent, the judge created a presumption of malice for both the murder and the arson charge.[3] To determine whether a jury charge has created an impermissible presumption, we must apply the following test: "If a specific portion of the jury charge, considered in isolation, could reasonably have been understood as creating a presumption that relieves the State of its burden of persuasion on an element of an offense, the potentially offending words must be considered in the context of the charge as a whole," to see whether "a reasonable juror could . . . have considered the charge to have created an unconstitutional presumption." *Franklin, supra* at 315. We conclude

---

[3]The judge correctly instructed the jury that the Commonwealth could prove the element of malice by proving that the defendant either "specifically intended to kill the victim . . . or . . . specifically intended to do grievous bodily harm to the victim . . . [or] intended to do an act creating a plain and strong likelihood that death or grievous bodily harm would follow." See *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 (1987). The judge also correctly informed the jury that this third form of malice required general rather than specific intent. See *Grey, supra* at 472 n.4; *Commonwealth* v. *Starling*, 382 Mass. 423, 428 (1981).

that no reasonable juror could have understood the challenged instructions as creating such a presumption.

It is doubtful that, even in isolation, the challenged language in this case could be understood as creating an impermissible presumption. It is not "cast in the language of command" like the sentences in *Franklin, supra* at 316 ("acts of a person of sound mind and discretion *are presumed* to be the product of the person's will" and a person "*is presumed* to intend the natural and probable consequences of his acts" [emphasis in original]). Nor does it instruct the jury that "*[t]he law presumes* that a person intends the ordinary consequences of his voluntary acts" (emphasis in original), as in *Sandstrom, supra* at 515. It does not even appear in a sentence of its own, as in *Commonwealth* v. *Sires*, 405 Mass. 598 (1989). However, so as not to rest our decision upon fine distinctions between the language here and that in other cases, we consider the challenged language in the context of the charge as a whole.

The offending phrase appears at the tail end of a sentence, and at the beginning of several paragraphs, explaining the type of unfocused, nondirect contemplation that constitutes general intent. Given the long and accurate illustration of general intent directly following and clarifying the challenged language, as well as the clear link between reasonable inferences and intent directly preceding it, no juror could have misconstrued the nature of general intent.

Furthermore, in addition to a lengthy general discussion of the presumption of innocence and the Commonwealth's burden of proving each element beyond a reasonable doubt immediately following her instructions on intent, the judge also instructed the jury as to the Commonwealth's burden of proof *specifically* with regard to the elements of intent and malice. In the middle of her description of general and specific intent, and following the challenged language, the judge emphasized the Commonwealth's burden of proof on both kinds of intent, by warning:

> "Intent, as I will tell you later on, is an element that must be proved by the Commonwealth and must be proved beyond a reasonable doubt; and as I said, I will alert you at that time when I use the word intent whether I'm speaking in terms of a specific or general intent."

In the middle of the charge on malice, the judge again emphasized the Commonwealth's burden of-proof:

> "In this regard, I instruct you that the defendant is not required in any way to show the existence of excuse or justification. *The defendant need not show or prove anything in this trial*; rather, the burden remains upon the Commonwealth to prove beyond a reasonable doubt the absence of any justification or excuse" (emphasis added).

There is some similarity between the challenged words in this case and part of the challenged instructions in *Commonwealth* v. *Sires*, 405 Mass. 598 (1989).[4] The charge in *Sires*, however, contained additional language which mandated the conclusion that, even read as a whole, the charge impermissibly shifted the burden of proof. In that case, in his charge on malice aforethought, the judge stated that "where the fact of killing is shown and there are no circumstances disclosed tending to show justification or excuse, *then there is nothing to rebut the natural presumption of malice. This is the legal definition of malice."* (Emphasis added.) The judge then repeated, twice, his statement on "the natural presumption of malice" in response to questions by the deliberating jury. *Sires, supra* at 599-600. This burden-shifting language was given as part of the charge on malice, and could reasonably have been interpreted by the jury as putting the burden on the defendant, once the fact of killing was shown, to rebut

---

[4] In *Sires, supra* at 599, the judge, when charging the jury on general intent, said: "Everybody is presumed to intend what they did in fact do, and the intent, when we do things many times, is present unconsciously."

the presumption of malice or prove circumstances tending to show justification or excuse.

In contrast, nowhere in the instant case did the judge say that malice is presumed from any fact. On the contrary, she always described malice in permissive terms. She told the jury, "You *may infer* malice from any deliberate or cruel act against another however sudden" (emphasis added). Further, in the part of the malice instruction the defendant argues was tainted by association with the language on general intent, the part describing the third form of malice, the judge stated that "if under the circumstances known to the defendant, a reasonable prudent person would have known of the plain and strong likelihood that death or grievous bodily harm would follow the contemplated act, malice *may be* found without any actual intent to kill . . ." (emphasis added).

In her instructions on arson, the judge also emphasized the inferential nature of a finding of malice. She stated: "Malice is a necessary element of the crime of arson. It doesn't need to be overtly expressed, it *may be inferred* from the *willful* act of burning without legal justification" (emphasis added).

When responding to a question from the deliberating jury, the judge again accurately explained malice in permissive terms, and again emphasized the Commonwealth's burden of proof with respect to that element of the crime. This contrasts starkly with the instructions in *Sires*, where the judge *twice* repeated the erroneous "presumption of malice" instructions to the deliberating jury.

We conclude that, given the accurate description of general intent immediately following and clarifying the challenged language; the clear linking of intent to inferences immediately preceding it; the emphasis on the Commonwealth's burden of proof specifically with regard to general and specific intent and with regard to malice; and the definition of malice in consistently permissive terms, no reasonable juror would have interpreted the instructions, taken as a whole, to have created a mandatory presumption of malice for either murder or arson.

b. *Intoxication and General Intent*:

The defendant also claims it was error for the judge to instruct the jury that "voluntary intoxication or impairment due to drugs or alcohol does not operate to prevent a defendant from forming the general intent as specified in that third form of malice."

The instruction was correct. This court has never ruled that a defendant is entitled to an instruction allowing the jury to consider the effect of intoxication on his ability to form general intent. See *Commonwealth* v. *Troy*, 405 Mass. 253, 260 (1989); *Commonwealth* v. *Henson*, 394 Mass. 584, 592 (1985). A defendant is, however, entitled to such an instruction when specific intent is a necessary element of the crime charged. See *Henson, supra* at 593. The defendant claims this distinction between general and specific intent is arbitrary and should not have been applied in his case. He argues the jury ought to have been able to consider the effect of intoxication on his ability to possess general intent, because, he claims, the victim's death was "unintended," and his reaction to the victim's alleged scratching and hitting was "defensive." We disagree.

To find a defendant possessed malice absent specific intent, the members of a jury have to find that the defendant intended to do an act, and that, in the circumstances known to the defendant, a reasonably prudent person would have known of the plain and strong likelihood that death or grievous bodily injury would follow that act. Only the circumstances known to the defendant are determined by a subjective measure. Whether death or injury was likely is determined by an objective measure. See *Commonwealth* v. *Grey*, 399 Mass. 469, 472 n.4 (1987).

There was no showing that Blake's intoxication had any relevant effect on the subjective component of his state of mind under this test. The defendant never claimed that he did not mean to hit the victim.[5] Evidence that he may not

---

[5]The defendant's statement, "It was an accident," referred to his intention to kill the victim, not his intention to hit her. In the section in his brief

have intended the *consequences* of hitting her, while relevant to whether he had specific intent, was not relevant to the objective component of the third form of malice. Nor was there any showing that, even in his intoxicated condition, the defendant did not *know* any relevant circumstances. That he may have felt threatened by the circumstances allegedly preceding the initial blow goes to his interpretation, not his knowledge, of the circumstances.[6] To allow consideration of the effect of intoxication on the defendant's judgment would mean every crime could be mitigated if committed when a defendant's judgment was impaired by alcohol or drug use. We certainly "turn our backs on the realities of today's society if we move in that direction." *Henson, supra* at 594 (Hennessey, C.J., concurring).

c. *McHoul instruction*:

There was evidence that the defendant was addicted to alcohol and drugs, and evidence that he had imbibed a large amount of beer, cocaine, and some marihuana at the time of the killing. The defendant's expert, a psychiatrist, testified that the defendant was addicted to alcohol, cocaine, and marihuana; that cocaine use can cause "psychotic episodes" that are similar to "acute manic depressive psychosis, wild and potentially very dangerous"; and that it can trigger the "fight or flight response," causing the user to perceive danger and strike out.[7] On cross-examination, the expert testified that he had found nothing organically wrong with the defendant. Defense counsel offered the psychiatrist's testimony to show the defendant was incapable of forming a specific intent.

---

on self-defense, the defendant suggests he struck the victim "reflexively," but does not claim that he did not mean to strike her or that he meant to do something else and struck her by mistake.

[6]See our discussion, below, of instruction on self-defense. The defendant would have us bootstrap consideration of his alleged "defensive" motivation by means of the instruction here, when it would not be sufficient to entitle him to an instruction on self-defense.

[7]The expert used these terms to describe the most destructive effects cocaine can have. He never said that the defendant had experienced such effects.

On appeal, the defendant claims for the first time that evidence of addiction, if accompanied by some additional threshold evidence on the issue of lack of criminal responsibility, should entitle the defendant to an instruction under *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967), and that the judge should have given such an instruction sua sponte in this case. We reject these claims.

Defense counsel neither raised the issue of lack of criminal responsibility at trial nor requested an instruction on that issue.[8] The standard for lack of criminal responsibility, set out in *McHoul*, *supra* at 546-547, provides: "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." We have held that neither alcoholism nor drug addiction is a disease or defect which, alone, can trigger the application of *McHoul*. See *Commonwealth* v. *Brennan*, 399 Mass. 358, 361 (1987) (alcoholism); *Commonwealth* v. *Sheehan*, 376 Mass. 765, 770 (1978) (drug addiction). The defendant argues that "medical and scientific research and development . . . makes outdated" this view. However, the defendant neither points to anything in the record nor presents any factual basis in his briefs to support this claim.[9] He provides no good reason for us to reconsider our treatment of the addiction issue in the instant case.

There was also no evidence in this case of any underlying, organic brain defect activated by alcohol consumption, such as that alleged in *Brennan*, *supra* at 362, which might have entitled the defendant to a *McHoul* instruction. There was

[8]Because we review the defendant's conviction under G. L. c. 278, § 33E, we make no effort to differentiate between the standard of review in noncapital cases mandated by *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967), and the § 33E standard. *Commonwealth* v. *Lennon*, 399 Mass. 443, 448 n.6 (1987).

[9]Defendant's own expert agreed, on cross-examination, that the defendant's use of alcohol and drugs was voluntary and that it is ultimately within the control of a person to decide whether he is going to use alcohol and drugs.

no basis for the judge to give a *McHoul* instruction on lack of criminal responsibility, even if one had been requested, and there was no error.

d. *Self-defense*:

Likewise, the judge did not err in failing to charge the jury, sua sponte, on the use of excessive force in self-defense as a mitigation of murder to manslaughter.[10] "A defendant is entitled to have the jury at his trial instructed on the law relating to self-defense if the evidence, viewed in its light most favorable to him, is sufficient to raise the issue." *Commonwealth* v. *Harrington*, 379 Mass. 446, 450 (1980). To warrant an instruction on self-defense, one requirement is that there must be evidence, warranting at least a reasonable doubt, that the defendant "had reasonable ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force." *Id.* Taken in the light most favorable to the defendant, the evidence at most indicates the defendant struck the victim with deadly force in response to her scratching, hitting, and yelling. The defendant himself never claimed, in his direct testimony or elsewhere, that he believed he was in imminent danger of death or serious bodily harm, nor could he reasonably have believed so in these circumstances. Furthermore, the defendant did not argue self-defense at trial and did not request an instruction on self-defense.

II. *Evidentiary Rulings*.

a. *Examination of Psychiatrist*:

The defendant claims the trial judge erred in sustaining an objection to the following question by the defendant of a defense medical expert: "And based upon your medical expertise, can you indicate . . . with a reasonable degree of medical certainty whether Bruce Blake would have had the

---

[10]The defendant also claims, in his brief, that the judge should have instructed the jury, sua sponte, on the defense of accident, but he limits his argument on that issue to the fleeting suggestion that he struck the victim "reflexively" in response to her alleged "freaking out" at the start of sexual relations.

mental capacity to entertain any form or plan or design whatsoever?" Since there was no offer of proof, there is no basis for us to conclude that the defendant has been harmed by the ruling. See P.J. Liacos, Massachusetts Evidence 78 (5th ed. 1981). Furthermore, defense counsel asked two other questions on the same subject, and the expert had testified at length about the effect of drugs and alcohol on the mind and behavior. In any case there was no error because the question did not clearly differentiate between the effects of alcohol on the capacity to form specific intent and general intent, and therefore it could have been excluded in the proper exercise of the judge's discretion as being overbroad and tending to confuse the jury.

b. *Photographs*:

1. Over defense counsel's objection, the trial judge admitted in evidence a photograph of the victim in life, that was given to the investigating officer to aid the police in locating the victim. The Commonwealth offered the photograph as relevant to "identification," because it would go to show that the investigating officer was unable to identify the victim at the scene by using the photograph. The officer testified: "The body was so badly beaten we couldn't identify it from the photograph." The prosecutor also offered the photograph for its bearing on the extent of the victim's injuries. The defendant argues the photograph was irrelevant and could have unfairly prejudiced the defendant by appealing to the jury's "emotionality and sympathy." The photograph did have minimal relevance on the issue of extreme cruelty since it permitted the jury to assess the extent of the victim's injuries in the traditional "before and after" context. In any case, given other testimony describing the victim prior to death, the extensive evidence apart from the investigating officer's testimony showing the severity of the victim's injuries, and the overwhelming evidence of guilt, any error in admitting the photograph would be nonprejudicial.

The argument that the photograph should not have been admitted because it was not properly authenticated fails as well, since no objection was made on this basis at trial.

Where there is no claim the photograph was not genuine, and defense counsel had sound tactical reasons for not challenging its authenticity,[11] no showing of a substantial likelihood of a miscarriage of justice has been made.

2. The defendant also argues that eleven photographs of the victim's body, taken at the scene and at autopsy, were improperly admitted by the judge because their inflammatory nature outweighed their probative value. Each of the photographs showed a different aspect of the victim's injuries, and was relevant on the issues of extreme atrocity or cruelty and deliberate premeditation. The judge viewed and considered the photographs after they had been substantially reduced from the number originally offered. Photographs that possess evidential value "are not rendered inadmissible solely because they are gruesome or may have an inflammatory effect on the jury." *Commonwealth* v. *Ramos*, 406 Mass. 397, 407 (1990), quoting *Commonwealth* v. *Bys*, 370 Mass. 350, 358 (1976). Further, whether their probative value was outweighed by their inflammatory nature was a determination within the sound discretion of the trial judge. *Commonwealth* v. *Ramos*, *supra*. *Commonwealth* v. *D'Agostino*, 344 Mass. 276, 279, cert. denied, 371 U.S. 852 (1962). There was no error.

III. *Alleged Prosecutorial Misconduct.*

The defendant's trial strategy was to portray the defendant as incapable of acting with deliberate premeditation, extreme atrocity or cruelty, or specific intent, because alcohol and drug use made him aggressive and violent beyond his control. In his opening, direct examination of witnesses, and closing, defense counsel focused on the defendant's history of bad acts and their relation to drug and alcohol use, attempting to show that the defendant became a different person when he drank or used drugs. In opening, defense counsel described the defendant as a "Jekyll and Hyde personality," and said

---

[11]Requiring a relative or friend of the victim to authenticate the photograph in the jury's presence could have risked an emotional response prejudicial to the defendant.

the defendant was a "time bomb, . . . a walking powder keg, and alcohol . . . and drugs on that night set it off." It was defense counsel who elicited testimony of the defendant's "less than honorable" discharge from the military, caused by his drug use, his involvement in group sex, and because he "assaulted someone." It was defense counsel who asked the defendant about the numerous other instances of his antisocial behavior, including the charges against him for malicious destruction of property and assault and battery. In his closing, defense counsel said: "One of the witnesses . . . said Bruce Blake was a guy who couldn't take no for an answer when he was drunk. What happens? [The victim] says no, in his words, she freaked out and scratched him. What did Bruce Blake do? Swung out and hit her."

The prosecutor did not introduce any evidence of prior bad acts of the defendant. She did, however, properly cross-examine the defendant about the same bad acts he had disclosed on direct, to try to establish that his alcohol and drug consumption did not prevent him from acting intentionally in those incidents. She also sought to establish that the defendant drank and took drugs despite the fact that he knew it might lead to socially unacceptable behavior. In closing, she stated in reference to the defendant: "We know he became aggressive [when drinking], that he became violent, that he engaged in all kinds of antisocial behavior. He was a powder keg, but it went off with regularity."

The defendant now claims the prosecutor overstepped the bounds of fair cross-examination and argument. In the circumstances, we can only wonder at the one-sidedness of the defendant's concept of fairness. The prosecutor properly argued the fair inferences that could be drawn from evidence the defendant offered. See *Commonwealth* v. *Earltop*, 372 Mass. 199, 205 (1977). Her descriptions of the defendant's personality and history were the same ones originated by defense counsel, turned to her own use. Her cross-examination and closing were not improper merely because they may have "reflect[ed] adversely on the trial tactics of the defense." *Commonwealth* v. *Cheek*, 374 Mass. 613, 619 (1978). *Com-*

*monwealth* v. *Dunker*, 363 Mass. 792 (1973). The defendant did not just open the door "a bit," as he concedes: he invited the prosecutor inside.

IV. *Ineffective Assistance.*

On the defendant's claim that his trial counsel rendered ineffective assistance, we must look to see whether counsel's conduct fell "measurably below that which might be expected from an ordinary fallible lawyer," and, if so, whether that conduct "likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974).

As discussed earlier, the judge's instructions on general intent and malice, taken as a whole, were not erroneous. Therefore, defense counsel's failure to object to the challenged language was not conduct falling "measurably below" that of "an ordinary fallible lawyer." The failure to request instructions on self-defense and lack of criminal responsibility also did not constitute ineffective assistance. Defense counsel was not obliged to pursue all theoretical defenses, no matter how little basis in the evidence existed for them. See *Commonwealth* v. *Stevens*, 379 Mass. 772, 774 (1980) ("Counsel had no obligation, indeed no right, to present a defense of lack of criminal responsibility which could not be supported by evidence").

In regard to defense counsel's handling of the psychiatrist's direct examination,[12] the defendant argues that his

---

[12]Defense counsel asked three questions of the psychiatrist probing the subject of the defendant's state of mind:

DEFENSE COUNSEL: "Doctor, based on what Mr. Blake told you and given your expert opinion in the field, can you indicate to this jury with reasonable medical certainty what effect the consumption of twenty to twenty-five beers and a gram of cocaine in that period of time could do to the mind?"
THE WITNESS: "Yes, there's no question in my mind that he, his central nervous system, his mind must have been experiencing all the effects or many of the effects of intoxication with both alcohol and cocaine."
DEFENSE COUNSEL: "And based upon your medical expertise, can you indicate to this jury with a reasonable degree of medical certainty whether Bruce Blake would have had the mental capacity to entertain any form or plan or design whatsoever?"
THE PROSECUTOR: "Objection."

counsel should have made an offer of proof when the judge sustained the objection to his question regarding the defendant's capacity to entertain any plan or design. Secondly, he argues that, when the psychiatrist gave an inadequate answer to the next, follow-up question concerning the defendant's thought processes, defense counsel should have tried to elicit a more fully detailed answer, rather than resting.

Even if counsel should have persisted with further questioning or neglected to supply, through an offer of proof, a meaningful and relevant answer to the excluded question, the defendant was not deprived of a substantial ground of defense. Defense counsel had elicited the psychiatrist's lengthy testimony about the defendant's dependence on drugs and alcohol, and about the effect of such drug and alcohol use on a person's thought processes and behavior. In closing, defense counsel related this testimony to the defendant's situation, clearly signalling how it applied to the defendant's capacity to form intent for the crime in question. Thus, the jury had ample opportunity to consider this ground of defense, and the defendant was not denied effective assistance.

V. *Constitutionality of Indictment and Verdict.*

For the reasons we discussed fully in *Commonwealth* v. *Freiberg*, 405 Mass. 282, 289-290, cert. denied, 493 U.S. 940 (1989), citing *Commonwealth* v. *Glass*, 401 Mass. 799 (1988), the indictment and verdict based on extreme atrocity or cruelty are not unconstitutionally vague or violative of the defendant's due process rights.

VI. *Review under G. L. c. 278, § 33E.*

In addition to the specific arguments raised here for the first time and commented on within, we have considered the entire case on the law and the evidence, and we find no rea-

---

THE COURT: "Sustained."
DEFENSE COUNSEL: "Can you indicate to the jury with reasonable medical certainty how impaired Mr. Blake's thought processes would have been at that point in time?"
THE WITNESS: "I think they would have been, on the basis of the intoxications, severely impaired."
At this point defense counsel rested.

son requiring a new trial or a reduction of the verdict in the interests of justice.

*Judgments affirmed.*