Commonwealth v. Mountry.

COMMONWEALTH vs. SOMDETH MOUNTRY.

Essex. May 7, 2012. - August 1, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Rape. Consent. Intoxication. Rape-Shield Statute. Constitutional Law,* Confrontation of witnesses. *Practice, Criminal,* Confrontation of witnesses, Instructions to jury.

At a rape trial, the judge did not abuse his discretion in excluding evidence of sexual activity between the victim and anyone other than the defendant, and the exclusion did not deprive the defendant of his constitutional right to confront witnesses against him, where the prejudicial effect of such evidence on the victim outweighed the rather tenuous probative effect it might have had on her credibility, given that the defendant failed to make the requisite showing that the victim had a motive to fabricate her allegation of rape. [85-88]

At the trial of indictments charging, inter alia, rape, the evidence was sufficient to permit the jury to find, beyond a reasonable doubt, that the defendant actually knew, and that he reasonably should have known, that the victim was so intoxicated as to be incapable of consent. [88-89]

This court concluded that, in a rape case where the Commonwealth relies on evidence that the victim was incapable of consent to establish the element of lack of consent and thereby reduce the degree of required force to that which is needed to effect penetration, and in which there is credible evidence of the defendant's mental impairment, not only must the Commonwealth prove that the defendant knew or reasonably should have known of the complainant's incapacitated state, but the defendant also is entitled to have the jury instructed that they may consider credible evidence of his mental incapacity, by intoxication or otherwise, when deciding whether the Commonwealth has met its burden of proof as to his knowledge of the victim's incapacity to consent [89-92]; thus, in a rape case, error arose from the judge's instruction that foreclosed the jury's consideration of the defendant's intoxication as to one element of knowledge, but the error was not prejudicial where the defendant was not entitled to a jury instruction on voluntary intoxication, given that there was no evidence of debilitating intoxication that would have hindered the defendant from possessing actual knowledge that the victim was incapable of consent or from possessing knowledge that reasonably would have led him to such an understanding [92-94].

INDICTMENTS found and returned in the Superior Court Department on March 3, 2006.

The cases were tried before *Howard J. Whitehead*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*William T. Harrington* for the defendant.

*Kenneth E. Steinfield*, Assistant District Attorney, for the Commonwealth.

SPINA, J. In *Commonwealth* v. *Blache*, 450 Mass. 583, 589 (2008), we held that where the Commonwealth relies on evidence that a rape victim was incapable of consent to establish the element of lack of consent and thereby reduce the degree of required force to that which is needed to effect penetration, "the Commonwealth should also prove the defendant's knowledge of the complainant's incapacitated state." Today we hold that a defendant in such a case is entitled to have the jury instructed that they may consider credible evidence of his mental incapacity, by intoxication or otherwise, when deciding whether the Commonwealth has met its burden of proof as to his knowledge of the victim's incapacity to consent.

Following a jury trial in the Superior Court, the defendant was convicted of rape and furnishing alcohol to a person under twenty-one years of age. On appeal he asserts error in the denial of his right to cross-examine the victim as to her motive to fabricate. He also alleges error in (1) the judge's denial of his motion for a required finding of not guilty as to the element that he knew or should have known of the victim's incapacity to consent, and (2) the judge's refusal to instruct the jury that they could consider the defendant's state of intoxication when deciding whether he reasonably should have known of the victim's incapacity to consent.[1] We transferred the case to this court on our own motion.

We hold that the judge's instruction was error, but the error did not prejudice the defendant because there was no evidence of debilitating intoxication. Therefore, he was not entitled to an instruction on voluntary intoxication. We affirm the convictions.

---

[1]Appellate counsel announced at oral argument that the defendant has withdrawn two arguments raised in his brief written by predecessor counsel, namely, the sufficiency of the evidence as to the element of penetration, and the admission of deoxyribonucleic acid (DNA) evidence through an analyst who had not performed the tests (a procedure to which the defendant had expressly agreed). We need not address these issues.

1. *Background.* The jury could have found the following facts. We reserve other details for discussion of particular issues. In the summer of 2004, the victim was sixteen years old and lived with her parents in France. A paternal aunt whom she had never met lived with the defendant in Gloucester. They had four children. The aunt arranged for the victim to fly to Boston on August 9, 2004, and spend two nights in Gloucester with the defendant and one of their children. The victim and her cousin would then fly to Las Vegas, where the aunt and her other three children were visiting family. The victim arrived in Boston on August 9 and was met at the airport by the defendant and his eleven year old son. They drove around Gloucester briefly, then went to the defendant's apartment and had dinner. The victim, tired from her flight, retired early.

On August 10, 2004, the defendant went to work. When he arrived home, he told the victim he would give her a tour of the area, then make her a special dinner. He asked if she drank. She said she did not like alcohol but drank on special occasions. After sightseeing, they stopped at a package store where the defendant purchased vodka and orange juice. They returned to the defendant's apartment for dinner. The defendant sent his son to his room, then asked the victim to mix some drinks for them. He mixed the drinks thereafter. The two sat down to a lobster and noodle dinner and conversation. During that conversation he asked if she had a boy friend, and learned that she did. After consuming a 750 milliliter bottle of vodka, the defendant and the victim drove to a package store to buy more vodka and orange juice. The defendant referred to her as "honey" and put his arm around her in the car. She pushed his hand away.

When they returned to the defendant's apartment, he offered her another drink, but she declined, having consumed more alcohol than she ever drank. She was tired and lay fully clothed on the bed. As she was falling asleep, the defendant entered the room and offered her another drink. She pushed it away, and he left the room.

She was awakened at about 5 A.M. the next morning by the defendant, dressed in his underwear and a T-shirt, pulling up her pants. She was on the bedroom floor. There was vomit on the bed, on her shirt, in her hair, and on the floor. The victim asked

what he had done to her during the night. He replied, "Nothing," and left for work. As she prepared to shower, she noticed her panties were on incorrectly, and a button was missing from her pants. She also noticed that her "privates" were "a little bit wet." She put her clothes in a plastic bag.

The victim's mother telephoned the house at about 10 A.M. that morning, at which time the victim told her mother what had happened in as much detail as she could recall. Her mother, the first complaint witness, testified that the victim also said that her "T-shirt was up" when she awoke and that she did not want to be pregnant. The victim's mother then telephoned the aunt in Las Vegas, and another daughter who was studying in Utah, to report what had happened.

The defendant returned to the apartment at lunchtime and arranged for a taxicab to take his son and the victim to the airport for their flight to Las Vegas. When the victim arrived in Las Vegas she told her aunt what had happened. Her aunt said the victim's mother had already telephoned her and reported what the victim had said. Her aunt said she was sorry for her and offered her $4,000 to spend on her vacation. She told the victim not to mention the money to her parents. About one month later, the aunt sent $4,000 to the victim in France.

In the meantime, the victim's sister drove from Utah to Las Vegas and took her to a hospital to be examined. A nurse at the hospital called for assistance from the Las Vegas metropolitan police department, after which a detective arranged for the victim's transfer to a different hospital, where she was examined by a sexual assault nurse examiner.

Vaginal swabs and other evidence were taken from the victim at the hospital. That evidence and the victim's clothing were given to Las Vegas police, who sent it to the Massachusetts State police crime laboratory, where it was examined and tests were conducted. Sperm cells were observed on one vaginal swab and on the crotch of the victim's panties. Deoxyribonucleic acid (DNA) tests were conducted on the samples containing sperm cells. STR analysis targeting fifteen areas across different chromosomes was performed on the sample from the panties. Y-STR analysis, focusing on the Y chromosome, was performed on the sample from the vaginal swab. Test results indicated a

match to the defendant's DNA from samples of both the vaginal swab[2] and the panties. The likelihood of a randomly selected unrelated person having a DNA profile matching the profile obtained from the sperm fraction of the sample from the panties is one in 1.92 trillion in the Asian population living in the United States,[3] one in 7.485 trillion in the Caucasian population, one in 256.5 trillion in the African-American population, and one in 1.352 trillion in the Hispanic population. As for the match between the sample from the vaginal swab and the defendant's DNA, the statistical probability is that one in 429 unrelated Caucasian males, one in 327 unrelated African-American males, and one in 199 unrelated Hispanic males will have a matching profile. Further statistical analysis indicated the profile from the vaginal swab is not expected to occur more frequently than one in 8,333 unrelated males worldwide. That is, over ninety-nine per cent of the unrelated male population could be excluded as the source of the DNA found inside the victim's vagina.

As a result of jurisdictional confusion, there was a delay of approximately sixteen months in the investigation. On January 4, 2006, the defendant was arrested and brought to the Gloucester police station, where he was interviewed. His interview lasted approximately thirty-three minutes, was audiotaped, and was played for the jury. The defendant told police that he did not pour any drinks for the victim but, believing people from France "love to drink," told her to help herself. He prepared a lobster and noodle dinner for her, his son, and himself. After dinner he visited a friend in the apartment building, then returned at about 11 P.M. and went to bed in his son's room. At about 5:30 or 6 A.M., he noticed the victim was sleeping on the floor of her bedroom. She awoke as he placed a blanket on her. When she asked him what had happened, he told her nothing had happened. He then went to work.

The defendant repeatedly told police he was drunk that night and could not remember if anything had happened between him

[2]Due to the overwhelming ratio of female to male DNA in the sample from the vaginal swab, the STR test could not identify the male DNA. The Y-STR test, which focuses on the Y chromosome, was able to identify a male profile in the sample.

[3]The defendant was born in Laos.

and the victim. He also told police that the victim was drunk and that she just did not remember. He acknowledged that the victim's aunt telephoned him after learning that the victim accused him of sexually assaulting her. He told her he did not think he did anything wrong, but when asked if he had "slept with" the girl, he told the aunt he "did not know." He admitted it was possible. He told the aunt if he had "slept with" the victim, they should send her some money, "just in case" they had "sex and [he could] not remember." He again acknowledged he could have had sexual intercourse with her. The defendant told police the aunt sent the victim $5,000 about a month later.

2. *Limitation on cross-examination.* The Commonwealth moved in limine pursuant to the rape shield statute, G. L. c. 233, § 21B, to exclude evidence of sexual activity between the victim and anyone other than the defendant. The defendant sought to introduce evidence that the victim had sexual intercourse five days before her examination at the hospital. Defense counsel asserted that hospital reports indicated the victim went to the hospital stating that her intention was to have a pregnancy test, and that she had intercourse on August 7, 2004 (two days before she arrived in Boston). The defendant argues, as he did below, that the victim had a motive to lie as to who might be the father if she were pregnant. Defense counsel speculated that the person with whom the victim had sexual relations on August 7 was her boy friend, that her parents would have disapproved because she was not yet seventeen years of age, and that the fact that she wanted a pregnancy test would have been communicated to her parents through her other relatives. Defense counsel argued that the victim could have created a distraction by fabricating the allegation of rape. The judge concluded that the probative value of the prior episode did not outweigh the prejudicial impact to the victim, and he allowed the Commonwealth's motion in limine.

The defendant argues that this limitation on cross-examination prevented him from eliciting evidence of the victim's motive to fabricate her allegation of rape, struck at the heart of the only viable defense he had (namely, the victim's credibility), and thereby deprived him of his constitutional right to confront and cross-examine witnesses called to testify against him, under the Sixth Amendment to the United States Constitution and art. 12

of the Massachusetts Declaration of Rights. See *Commonwealth v. Joyce*, 382 Mass. 222, 225-227 (1981).

The rape shield statute bars admission of "[e]vidence of the reputation of a victim's sexual conduct [and e]vidence of specific instances of a victim's sexual conduct . . . except evidence of the victim's sexual conduct with the defendant or evidence of recent conduct of the victim alleged to be the cause of any physical feature, characteristic or condition of the victim." G. L. c. 233, § 21B. The primary purpose of the statute is to prevent a general credibility attack of a victim with evidence of his or her promiscuity. *Commonwealth v. Fitzgerald*, 412 Mass. 516, 523 (1992).

In addition to the statutory exceptions permitting admission of such evidence, we have recognized that other exceptions may arise under the United States Constitution and the Massachusetts Declaration of Rights. One such exception arises where such evidence is relevant to a victim's bias or motive to fabricate. See *Commonwealth v. Joyce, supra* at 225-229. A defendant must show that the proffered evidence is relevant to the question of a victim's bias or motive to fabricate. *Id.* at 231 & n.10. He must "make a plausible showing that the circumstances existed on which the alleged bias [or motive to fabricate] is based" in order to cross-examine a victim as to such evidence. *Commonwealth v. Tam Bui*, 419 Mass. 392, 401, cert. denied, 516 U.S. 861 (1995). A judge retains broad discretion to admit such evidence and may limit and "control the scope of cross-examination . . . once the jury have been 'adequately exposed' to the issue of bias." *Commonwealth v. Joyce, supra* at 231, quoting *Commonwealth v. Dougan*, 377 Mass. 303, 309-310 (1979). See *Commonwealth v. Hicks*, 377 Mass. 1, 8 (1979). "In the exercise of this discretion a trial judge should consider the important policies underlying the rape-shield statute [and] should exclude evidence [barred by the statute] in so far as that is possible without unduly infringing upon the defendant's right to show bias [or motive to fabricate]." *Commonwealth v. Joyce, supra*. A judge must determine whether the weight and relevance of the proffered evidence outweighs its prejudicial effect on a victim. *Commonwealth v. Harris*, 443 Mass. 714, 721 (2005).

Here the defendant failed to make the requisite showing that

the victim had tried to conceal her relationship with her boy friend in order to avoid confronting her disapproving parents. He only speculated that this was the case. Contrast *Commonwealth* v. *Stockhammer*, 409 Mass. 867, 876 n.4, 880 (1991) (defendant's offer of proof that victim's parents' "[stern disapproval] of pre-marital sex, . . . the strength of her fear about any revelation to her parents of her consensual sexual activity[, and her] efforts to conceal this sexual relationship [provided] strong corroboration for her motivation to falsify her accusation against the defendant" was sufficient to allow some cross-examination on matter, particularly where defense was consent). The victim made no effort to conceal from hospital personnel her relationship with her boy friend, and the record reflects that it was the victim's aunt, not the victim, who first raised the subject of a pregnancy test. The aunt told police she had spoken to the defendant, who said nothing had happened, but she did not believe him.

Although the victim's credibility was an issue, it was hardly the only viable defense the defendant had, as he now argues. It was not even a major area of the defense. The victim had not made a direct accusation of rape against the defendant because she had been too intoxicated to understand what had occurred. She was awakened by the defendant's efforts to dress her, felt wet, and only assumed something had happened. She never knew exactly what that was. The defendant made much of the victim's failure to say she had been raped, as well as his own statement to police that he had been too intoxicated to know what really had happened. He forged a defense based primarily on the argument that the Commonwealth failed to prove penetration, by DNA evidence or otherwise. The biggest obstacle in the case for the defense was not the credibility of the victim. Given that the defendant told police he knew she had been drunk, whatever credibility issues surrounded her drinking history were minimal. Moreover, the defendant's statement to police that the victim had been drunk undermined his claim that he had been too drunk to know that she was too drunk to be capable of consent. The crux of the defense was lack of penetration, and the real challenge for the defense was the DNA evidence.

We conclude that the judge did not abuse his discretion in

excluding evidence that the victim said she had sexual intercourse with her boy friend five days before her examination at the hospital, where the prejudicial effect of such evidence on the victim outweighed the rather tenuous probative effect it may have had on her credibility and the issues that truly were at play in this trial.

3. *Sufficiency of the evidence.* The defendant asserts error in the denial of his motion for a required finding of not guilty as to the element that he "knew or reasonably should have known" of the victim's incapacity to consent to sexual intercourse. *Commonwealth* v. *Blache*, 450 Mass. 583, 595 n.19 (2008) (*Blache*). Viewing the evidence in the light most favorable to the Commonwealth, see *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979), the jury could have found that the defendant actually knew, and that he reasonably should have known, that the victim was so intoxicated as to be incapable of consent. The jury were not required to credit the statement he made to police to the effect he had been so drunk he could not remember what had happened. Even if the jury did credit the statement that he could not remember, they were not required to conclude that absence of memory signified lack of knowledge that the victim had been incapacitated. They could have credited other portions of his statement, particularly where he acknowledged the victim had been too drunk to remember what had happened. He essentially admitted the requisite knowledge, and the prosecutor highlighted this statement in her closing argument.

The jury also could have found that the defendant had sexual designs on the victim, having inquired about her interest in boys and alcohol, and having sent his son to his room so he could have dinner alone with her. He plied her with alcohol while they ate and made advances toward her in the car as they drove to the package store to purchase more alcohol. After she rejected his advances and went to her bedroom, he persisted, bringing her more alcohol, which she again refused. Determined, he waited until she passed out before he returned to her bedroom to have sexual intercourse without resistance. There was ample evidence from which a jury reasonably could conclude that the defendant intended to get the victim so intoxicated that he could have sexual intercourse with her and she would not remember

or even know what was happening. A jury easily could conclude that he had actually known the victim was incapable of consent when he had intercourse with her, and also that he reasonably should have known she could not consent. There was no error.

4. *Jury instruction.* In *Blache, supra* at 588-598, we clarified the element of "by force and against [the] will" of a victim of rape in circumstances where a victim is incapable of consenting to sexual intercourse. In this case, the defendant presented evidence of his own incapacity, due to intoxication from alcohol, to know or have reason to know of the victim's incapacity to consent, also by reason of intoxication. This particular issue was not presented in *Blache*.

The judge instructed the jury as follows:

> "The third prong which the Commonwealth must prove beyond a reasonable doubt, to make out the crime of rape, is that the defendant knew, or in the alternative, he reasonably should have known that [the victim] was impaired, to the point that she was incapable of giving consent.
>
> "*When I say that the defendant knew that she was so impaired, I mean that he had actual, subjective knowledge* of the fact, that he was conscious and aware of that fact. On this point, *on the point of the defendant's knowledge, you may consider any impairment of the defendant's own thought process by reason of any intoxication on his part.*
>
> "When I say the Commonwealth, *in the alternative, must prove that the defendant reasonably should have known that [the victim] was impaired, I mean this: That the average, reasonable person, not intoxicated, and observing the situation as it existed, would have known that [the victim] was incapable of giving consent.*
>
> "Thus, on the issue of knowledge, the burden is on the Commonwealth to prove beyond a reasonable doubt, at least one of these circumstances. Either that the defendant knew that [the victim] was incapable of giving consent, or even if he didn't know himself, the average reasonable person, would have known that she was impaired to the point that she was incapable of giving consent." (Emphases supplied.)

The defendant objected to the instruction. The jury requested reinstruction, after which the judge gave essentially the same instruction, over the defendant's objection.[4] The defendant argues that it was error not to instruct the jury that they could consider evidence of his intoxication both as to the subjective component and the "objective" component ("reasonably should have known") of the instruction set forth in *Blache, supra* at 595 n.19.

In *Blache, supra* at 589, we held that where the Commonwealth relies on evidence that a rape victim was incapable of consent in its effort to establish the element of lack of consent and thereby reduce the degree of required force to only such force as is necessary to effect penetration, "the Commonwealth should also prove the defendant's knowledge of the complainant's incapacitated state." As noted above, *Blache* did not present an opportunity to address the question of a defendant's incapacity to know whether a victim was incapable of consent. This case presents that occasion.

It is true, as the Commonwealth argues, that intoxication has no mitigating effect on general intent crimes such as rape. *Commonwealth* v. *Troy*, 405 Mass. 253, 263 (1989). However, when proof of knowledge is an element of the crime charged, as here, a defendant's mental impairment by intoxication or otherwise[5] "bears on [his] ability to possess the requisite knowledge of the circumstances in which he acted." *Commonwealth* v. *Sama*, 411 Mass. 293, 298 (1991). In that case, we held that a jury should consider a defendant's intoxication when deciding whether the Commonwealth has met its burden of proof as to the knowledge component of the third prong of malice applicable in murder cases. The third prong of malice requires a general intent, unlike the first two prongs of malice, which require a specific

---

[4]Although trial counsel's argument in support of the objection was not as precise as the argument presented by appellate counsel, we are satisfied that it was adequate to preserve the issue for appellate review.

[5]Of course, an instruction on voluntary intoxication need not be given absent evidence of debilitating intoxication that could support a reasonable doubt as to the defendant's ability to possess the requisite knowledge. See *Commonwealth* v. *Morales*, 461 Mass. 765, 786 (2012); *Commonwealth* v. *James*, 424 Mass. 770, 789 (1997); *Commonwealth* v. *Andrade*, 422 Mass. 236, 245-246 (1996).

intent. See *Commonwealth* v. *Blake*, 409 Mass. 146, 151 n.3 (1991). The third prong of malice also requires the Commonwealth to prove that, in the circumstances *known* by the defendant, a reasonably prudent person would know that his conduct carried with it the risk of death or serious bodily injury. See *id.* It is a mix of both subjective and objective components on which a defendant's mental capacity has relevance. See *Commonwealth* v. *Mello*, 420 Mass. 375, 389-390 (1995). Thus, even as to general intent crimes, a defendant's intoxication is relevant if the crime contains an element of knowledge.

In *Commonwealth* v. *Lawson*, 46 Mass. App. Ct. 627 (1999), the Appeals Court, citing *Commonwealth* v. *Sama, supra,* held that as to the crime of resisting arrest, G. L. c. 268, § 32B, a general intent crime that requires proof that the defendant "knowingly" prevented or attempted to prevent a police officer acting under color of his official authority from effecting an arrest, credible evidence of a defendant's intoxication entitles him to an instruction that the jury may consider such evidence when determining whether the Commonwealth has met its burden of proving that he had the ability to possess the requisite knowledge. *Commonwealth* v. *Lawson, supra* at 629-630. The present case falls within the rule of *Commonwealth* v. *Sama, supra.*

The instruction in *Blache, supra* at 595 n.19, has two alternative elements of knowledge. The first, actual knowledge, is a subjective element for which a defendant's state of intoxication has relevance. The second alternative, that the *defendant* reasonably should have known of the victim's incapacity, contains a mix of subjective and objective components, much like the third prong of malice. The subjective component focuses on the defendant's capacity to possess the requisite knowledge, for which his state of intoxication has relevance. The objective component focuses on what the average prudent person possessing the defendant's knowledge would have understood regarding the victim's incapacity. We conclude that, in a rape prosecution in which the Commonwealth must prove that a defendant knew or reasonably should have known that a victim's condition rendered him or her incapable of consenting, and where there is credible evidence of a defendant's mental impairment, a defendant is entitled to the jury's consideration of his mental

condition as it relates to his ability to possess the requisite knowledge.

Turning to the instructions in this case, the judge gave a correct instruction on the question whether the defendant actually, or subjectively, knew that the victim was incapable of consent. He told the jury they could consider credible evidence that the defendant was impaired by reason of voluntary intoxication. However, the instruction on the alternative element, that the jury could consider what "the average, reasonable person, *not intoxicated*, and observing the situation as it existed, would have known" concerning the victim's capacity to consent (emphasis added), was error. It effectively foreclosed consideration of evidence of the defendant's intoxication as to the alternative element of knowledge. Contrary to the judge's instruction, this element of knowledge is not purely objective. The Commonwealth had to prove what "*the defendant* reasonably should have known" (emphasis added), not what the average reasonable unintoxicated person would have known. A defendant's impaired state of mind is relevant to the jury's determination of this element. As with the element of knowledge in the third prong of malice, the judge should have instructed the jury that the Commonwealth must prove that in the circumstances known to the defendant, a reasonable person would have known that the victim was incapable of consent, and that when deciding whether the Commonwealth has met its burden of proof, they could consider any credible evidence that the defendant was affected by the voluntary consumption of alcohol. See *Commonwealth* v. *Sama, supra*.

We hasten to emphasize that our decision today should in no way be construed as reconsideration of our rejection of mistake of fact as a defense to rape cases generally. See *Blache, supra* at 593; *Commonwealth* v. *Lopez*, 433 Mass. 722, 727-728 (2001). Our holding is confined to cases in which the Commonwealth relies on proof that a victim was incapable of consent.

We turn to the question of prejudice. A conviction may be affirmed in the face of an error that has been preserved for review only if we are convinced that the error did not influence the jury, or had but very slight effect. *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994). We are satisfied there was no

prejudice. The defendant was not entitled to an instruction on voluntary intoxication because there was no evidence of debilitating intoxication that would have hindered him from possessing actual knowledge that the victim was incapable of consent or from possessing knowledge that reasonably would have led him to such an understanding. See *Commonwealth* v. *Morales,* 461 Mass. 765, 786 (2012); *Commonwealth* v. *Andrade,* 422 Mass. 236, 245-246 (1996).

The evidence of his impaired state was weak. The defendant may have consumed a substantial amount of vodka, but it is not clear whether he actually did so and how much. After drinking, he was able to drive to a package store, purchase more vodka, and drive back to his apartment with no evidence of difficulty. He also was able to understand that the victim was not interested in his advances when she pushed his hand away while they drove to purchase more alcohol. Further, he was able to understand that the victim wanted neither conversation nor more alcohol after they returned from purchasing more vodka. When she pushed away the drink he offered her in her bedroom, he left the room. In each instance he was capable of understanding and accepting her lack of any romantic interest in him. The defendant told police, and the defendant's son testified on his behalf, that he went upstairs after dinner to visit a friend in another apartment, then returned at about 11 P.M. and went to sleep. There is no evidence that he consumed more alcohol in the friend's apartment. The defendant's son observed him because they slept together in the son's room while the victim was staying in the defendant's room. There was no indication from the son that the defendant was experiencing difficulty from intoxication or that he was even drunk. The son testified only that he could smell alcohol on the defendant. The only evidence of the defendant's condition is his own statement to police that he had been drunk and had difficulty remembering what had happened, which alone does not signify an inability to appreciate the victim's incapacity. Moreover, he told police the victim had been too drunk to remember, which suggests he actually had appreciated her incapacity to consent. This does not qualify as "debilitating intoxication." He was not entitled to a voluntary intoxication instruction.

The defendant's conversation with the victim's aunt suggests he knew exactly what he had done, that he knew it was wrong, and that his claimed memory loss was merely a convenience. Finally, his act of dressing the victim while she was asleep and his suggestion that the aunt send money to the victim are potent evidence of consciousness of guilt. The case against him was overwhelming, the evidence of intoxication was very weak, and we are convinced that no jury, properly instructed, would have acquitted him. The error in the instruction was not prejudicial.

*Judgments affirmed.*